Harvey Brown, Justice *793 Jorge Luis Estrella was convicted of felony injury to a child for failing to provide medical care for a burn suffered by his son, J.E. (pseudonymously referred to as "Jason").[1] He was sentenced to nine years' confinement. In five issues, Estrella challenges the sufficiency of the evidence supporting his conviction, contends there was error in the trial court's charge, and argues that the trial court erroneously limited his cross-examination of his son.
Estrella also was convicted of felony injury to a child for failing to provide Jason adequate nourishment. The jury assessed punishment for that offense at 10 years' confinement but recommended that the sentence be suspended and that Estrella be granted community supervision. With regard to this second conviction, Estrella challenges the legal sufficiency of the evidence and, again, argues that the trial court erroneously limited his cross-examination of Jason.
We affirm both convictions.[2]
Background
A nine-year-old boy rang the doorbell of the home of J.S., pseudonymously referred to as Jane. The temperature was in the 30s, yet the boy, later identified as Jason, was wearing only shorts and a long-sleeved shirt. He was not wearing socks or shoes. Jane described his startlingly poor physical condition, testifying that she had "never seen anything like that before." His bare legs were "skinny as a rail." One leg looked like it was "knocked out of joint or broken or something." The boy's skin was not a healthy color, or even the color of red that would be expected from being exposed to cold weather; instead, it was "salmon colored." She had "never seen that color skin" on a person. The boy's eyes were swollen almost shut, and his eye sockets protruded out past his cheek bones. Jane brought Jason into her house. She immediately fed him, and he would ask for more food as he finished each serving. Jason was very hungry.
Jane called a neighbor over, and they called for police and emergency medical assistance. The police and EMS personnel arrived quickly. EMS notes state that Jason was emaciated with atrophy to both arms and legs, distension and rigidity in his abdomen, and swelling in his face and eye orbits. Jason had trouble supporting his own weight and could not walk well. His hair was thin, and he had bruising and scars across his body. Jason seemed very hungry.
A scar on Jason's hip, according to emergency medical personnel who evaluated him at Jane's house, indicated that he had suffered an extensive, painful burn that would have required immediate medical attention. Jason had a second burn scar on his arm.
*794 Jason was taken to Texas Children's Hospital in Katy, where he was weighed, examined, and photographed. Jason, at age nine, weighed 52 pounds. A doctor testified that was the average weight for a six-year-old child.[3]
The examination photos were admitted into evidence. They show a young boy with extremely thin legs, no muscle development on his arms or legs, and protruding knee joints. His underwear hung from his body with gapes in the leg holes. His stomach was distended. And his eye sockets were swollen to the point that they protruded out beyond his cheek bones.
The physical exam and photos also revealed an older burn to Jason's arm and hip. The hip burn was described as "extensive" by medical personnel. It wrapped around his groin area. It covered an area from his hip, traveling down between his legs, and then up the other side of his body. The burn scar was a combination of red and dark red, almost black colors. Dr. Isaac, the Texas Children's pediatrician who took over Jason's care after he was transferred from the emergency center, testified that the burn pattern indicated that an accelerant had been used. The accelerant appeared to have pooled in the groin crease and flowed outward when it ignited. The extensiveness of the scarring indicated to Dr. Isaac that Jason had not received appropriate medical care for his hip burn.
After being evaluated, Jason was admitted to the hospital with a diagnosis of chronic malnutrition resulting from child abuse. A chest x-ray revealed that he also had a ruptured lung, and additional testing revealed that he had a foreign body lodged in one of his feet. Medical staff attended to his medical needs and monitored his health as food was reintroduced. While at Texas Children's, he gained 11 pounds in nine days.
Trial testimony established that Jason had been living in a house across the street from Jane with his father, Estrella (the defendant-appellant), and his step-mother. Jason also lived with five step- and half-siblings. He was the only child in the home that was not the biological child of his step-mother.
Jason testified that he began to be treated differently after his step-mother suspected him of taking one of her rings. She burned his arm and his hip as punishment for taking the ring. There was evidence Estrella and his wife took Jason to Mexico the following day for medicine for the burns. Around the same time, Jason's step-mother began confining him to a locked closet without adequate food or water.
There was evidence that the other children in the home were treated differently. All the other children had bedrooms and beds, but Jason testified that he slept in a locked closet. The police inspected the home and found that the bedroom upstairs where Jason's parents said he slept was barer than the other bedrooms and did not have a mattress on the bed frame. There were dozens of pictures of the other children throughout the home and virtually none of Jason. Additionally, all the other children attended public school, but Jason was "homeschooled." The other children were on Medicaid and saw local physicians when they became ill, but according to Estrella and Jason's step-mother, Jason had no medical coverage and would be taken to Mexico for any medical care.[4]
*795 The children were not fed equally either. All the other children testified that they ate regularly, but Jason testified that he was frequently denied food and water. There was evidence that the parents kept the kitchen pantry locked and that every child except Jason knew where the key was stored. The parents claimed that Jason's food intake was more closely monitored because he had undiagnosed food allergies and had recently eaten an unknown item that caused the face swelling seen in the medical photographs. But the doctors who examined Jason at Texas Children's Hospital testified that there was no medical evidence that Jason had an allergic reaction as the parents described.
Jason testified to what he believed caused his face swelling. He had become so thirsty the week before he escaped the house that he drank his own urine. His face swelled up, his step-mother saw it, and she moved him from the closet to the upstairs bedroom. A few days later, while Estrella and Jason's step-mother were away shopping, Jason escaped out the bedroom window and walked to Jane's house. Jason told emergency medical personnel that he had not eaten for two days when he escaped.
Following Jason's recovery at Texas Children's Hospital, the State removed him from the family home. He lived with foster parents but eventually moved back to Brownsville to live with his biological mother.
Estrella was charged with two injury-to-a-child offenses, both by omission: one for withholding nutrition and the other for failing to provide medical care for the hip burn Jason suffered months before his escape.
Statutory Offense of Injury to a Child by Omission
A person commits the offense of injury to a child by omission if, having a legal duty to act, he "intentionally, knowingly, or recklessly by omission, causes to a child ... serious bodily injury ... or bodily injury." TEX. PENAL CODE § 22.04(a)(1), (3) ; see id. § 22.04(b) ; see also Jefferson v. State , 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). The offense is a first-degree felony when the mental state is intentionally or knowingly and the result is serious bodily injury. TEX. PENAL CODE § 22.04(e).
Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). It is not enough for the State to prove that the defendant engaged in the alleged conduct with the requisite criminal intent; the State must prove that the defendant caused the result with the requisite criminal intent. See Cook v. State , 884 S.W.2d 485, 490 (Tex. Crim. App. 1994) ; Lee v. State , 21 S.W.3d 532, 540 (Tex. App.-Tyler 2000, pet. ref'd).
Estrella was convicted of two injury-to-a-child offenses, each with a different mental state. One conviction was for intentionally or knowingly causing a serious bodily injury to Jason by omission-that is, failing to obtain appropriate medical treatment for his hip burn. The second conviction was for recklessly causing a serious bodily injury to Jason by omission-that is, failing to provide adequate nourishment to Jason.
A person acts "intentionally" with respect to a result of his conduct when it is *796 his conscious objective or desire to cause the result. TEX. PENAL CODE § 6.03(a). A person acts "knowingly" when he is aware that his conduct is reasonably certain to cause the result. Id. § 6.03(b). A person acts "recklessly" when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. Id. § 6.03(c). The result here, "serious bodily injury," includes a "bodily injury ... that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Id. 1.07(a)(46); cf. id. § 1.07(a)(8) (defining "bodily injury" as "physical pain, illness, or any impairment of physical condition").
Thus, for these two offenses, the State was required to prove more than that Estrella failed to provide medical care and nourishment. It had to prove that Estrella caused serious bodily injuries and had the requisite mental state with regard to the resulting serious bodily injuries. See Thompson v. State , 227 S.W.3d 153, 160 (Tex. App.-Houston [1st Dist.] 2006, pet. ref'd).
Sufficiency of the Evidence
Estrella challenges the legal sufficiency of the evidence to support his convictions. With regard to injury-to-a-child for failure to provide nourishment, he argues there is insufficient evidence of causation, meaning the evidence is inadequate to establish that Jason's malnourishment caused a serious bodily injury.
With regard to injury-to-a-child for failure to provide medical care, he argues that the evidence is legally insufficient to establish any failure to act and legally insufficient to causally link a delay in treatment to a serious bodily injury.
A. Standard of review
In an appeal of a criminal conviction, we review a challenge to the sufficiency of the evidence under the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 318-20, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See Brooks v. State , 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Under the Jackson standard, evidence is insufficient when, considered in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. See Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ; Laster v. State , 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. Malik v. State , 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).
We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from that evidence. Clayton v. State , 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We resolve any inconsistencies in the evidence in favor of the verdict. Curry v. State , 30 S.W.3d 394, 406 (Tex. Crim. App. 2000) ; see Clayton , 235 S.W.3d at 778 ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").
Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to witness testimony. Penagraph v. State , 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981) ; Jaggers v. State , 125 S.W.3d 661, 672 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd). The jury may choose to believe or disbelieve any part of a witness's testimony. Davis v. State , 177 S.W.3d 355, 358 (Tex. App.-Houston [1st Dist.] 2005, no pet.). Inconsistencies or contradictions in a witness's testimony do not destroy that testimony as a matter of *797 law. McDonald v. State , 462 S.W.2d 40, 41 (Tex. Crim. App. 1970).
Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. Sorrells v. State , 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).
The Jackson standard defers to the factfinder to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ; Clayton , 235 S.W.3d at 778. An appellate court presumes the factfinder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. See Jackson , 443 U.S. at 326, 99 S.Ct. 2781. If an appellate court finds the evidence insufficient under this standard, it must reverse the judgment and enter an order of acquittal. See Tibbs v. Florida , 457 U.S. 31, 41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).
B. Offense of failure to provide nourishment
Estrella contends there is insufficient evidence that he failed to provide nourishment and that the failure caused a serious bodily injury to Jason. We disagree. There is ample evidence of both elements of this offense.
Jason testified that his parents locked him in a small closet for days without food and water. He further testified that he had been denied food for two days straight when he escaped to Jane's house.
The medical personnel testified that Jason showed physical signs of emaciation, had distension and rigidity in his abdomen, and could not support his own weight due to his deteriorated physical condition. At the hospital, Jason weighed 52 pounds, which was his weight three years earlier before being denied nourishment. Once the doctors reintroduced food, he gained 11 pounds in nine days. The physicians testified that the rapid weight gain was evidence that he had been denied food previously.
The medical photographs show Jason's extremely thin legs and arms. There is no noticeable muscle development. His legs are too thin to contact the edges of his underwear that hang below his distended stomach. His knee joints are visibly wider than his thighs or calves.
Finally, Jason was diagnosed with chronic malnutrition after examination at Texas Children's Hospital. The physicians testified that the degree of malnutrition suffered by Jason was more extreme than any other case they had seen, except while working outside the United States. When questioned about the parents' explanation that Jason had not eaten well for only a few days and as a direct result of an allergic reaction to food, the physicians explained that the degree of emaciation was more severe than would be possible from only a few days of inadequate nutrition. Instead, Jason's physical appearance supported a medical conclusion that he had chronic malnutrition over weeks or months.
This evidence provides legally sufficient evidence that Estrella denied his son nourishment. The physicians' testimony also provides legally sufficient evidence that Jason suffered a serious bodily injury because of the malnourishment. See Baldwin v. State , 264 S.W.3d 237, 243 (Tex. App.-Houston [1st Dist.] 2008, pet. ref'd) (affirming conviction of caregiver on evidence boys showed signs of severe malnourishment *798 with extreme thinness and no weight gain for three years).
We conclude that there is legally sufficient evidence to support the conviction for injury to a child by omission for failure to provide nourishment.
C. Offense of failure to obtain medical care for Jason's hip burn
Estrella also challenges the sufficiency of the evidence with regard to the conviction for failure to obtain medical care, arguing that there is inadequate evidence of a failure to act and of a causal link between a one-day delay in treatment and a serious bodily injury.
1. Evidence regarding the burn, the timing of treatment, and the aftercare
Jason testified that his step-mother burned his hip and groin area as punishment for allegedly taking her ring. When Estrella returned home from work later that day, his wife showed him the burns. Estrella testified that he called his uncle, who is a physician in Mexico, and his uncle told him to take Jason to the doctor "as soon as [he] could."[5]
Estrella's wife testified that she also told Estrella that he should take Jason to a doctor, but Estrella chose not to go to the hospital, emergency room, or urgent care facility that day. Instead, he waited until the next day and elected to drive several hours to Mexico before initiating medical treatment for his son. That next morning, the entire family-Jason, his father and step-mother, and all five of the other children-drove more than five hours and 350 miles from Houston to Mexico. Before entering Mexico, though, the family detoured to Brownsville and dropped off the five other children at their grandparents' house.
The doctor in Matamoros prescribed ointments, which Jason's step-mother administered at home. Estrella and his wife testified that they followed the doctor's instructions for wound care. But neither of them took Jason to a doctor for follow-up care in the United States or in Mexico. Estrella testified that the burns were healing within a couple days.
Estrella explained why he drove Jason to a doctor in Mexico the day after the burn instead of taking him to a local emergency room or urgent care center "as soon as [he] could" as his uncle had recommended. He testified that Jason did not have medical insurance and therefore did not go local doctors-in general and for the burns specifically-due to the cost. Estrella testified that he chose to drive to Mexico to obtain treatment for Jason's burns because it would be more "efficient" and cheaper than seeing a local doctor.[6] On cross-examination, though, it was established that Estrella was a degreed engineer with a six-figure salary and that all the other children in the home would see local doctors for their illnesses and injuries.
When each of the siblings was asked about Jason's burns and extensive scarring, they testified that they had no idea that Jason had ever been burned, even though they all had ridden several hours in the car with Jason that day. Estrella's wife agreed that none of the children knew that Jason had been burned or that they were driving to Mexico to treat his burns. Whatever was done in the home to treat Jason's extensive burns, the other children remained *799 unaware of the burn incident or the treatment.
Jason testified that the only treatment he received from a doctor for his burns was during the one-day trip to Mexico. He testified that the trip to Mexico did not occur the same day he was burned. It was delayed. After the trip to Mexico, his step-mother changed his bandages, applied ointments, and poured an alcohol-based product on his burns. He stated that the burn was painful.
Dr. Shah, the pediatric emergency physician who treated Jason upon his arrival at the emergency room the day he showed up at Jane's house, testified that, given the extensive scarring on Jason's hip, the burn had passed through several layers of skin. In his medical opinion, a burn that severe would have caused "significant pain" and would have required immediate medical attention as well as follow-up medical care with physicians to adequately address skin tightening and other healing complications associated with burns to joint and groin areas.
On the issue of whether Jason's burn healed adequately, Jason testified that the extensive scarring in his groin continues to cause him pain years later, and his treating physicians testified that the burn had not healed appropriately.
2. Evidence of an omission
Estrella contends that there is legally insufficient evidence of an omission-a failure to provide necessary medical care for Jason-by pointing to evidence that he acted in accordance with medical advice. Specifically, he argues that his uncle "instructed" him "regarding the method of treating burns" and "advised" him only that Jason "should see a doctor." Estrella argues that he treated Jason's burns "in accordance with the doctor's directives" by taking Jason to see a doctor "in the ensuing early morning hours," thereby "[f]ollowing the doctor in Mexico's advice."
Estrella's argument mischaracterizes the evidence. First, Estrella's uncle's statement that Jason "should see a doctor" was not void of any temporal urgency as Estrella suggests. Instead, according to Estrella's testimony, his uncle told him to take Jason to the doctor "as soon as [he] could":
Prosecutor: So ... when you waited to take him to Mexico the following day, did a medical doctor tell you to wait and take him down to Mexico to get medical treatment?
Estrella: My uncle, Dr. Jose, he informed me to take my son as soon as I could.
...
Prosecutor: Okay. So a medical doctor did tell you to take him immediately or as soon as you could to the doctor?
Estrella: Yes.
Second, Estrella's brief describes the trip to Mexico as occurring "in the ensuing early morning hours," suggesting only a couple or, at most, a few hours had passed. More accurately, Estrella found out about Jason's burns at the end of his work day, looked at the burns when he got home from work, obtained no medical care for Jason the rest of that day or night, and then, the next day, drove several hours to Brownsville and, ultimately, to Mexico. Jason saw a doctor only after the family completed the lengthy trip. The delay in treatment was well over 12 hours from the point that Estrella became aware of the severe burns to when Jason received any medical evaluation.
Third, Estrella characterizes his actions as "[f]ollowing the doctor in Mexico's advice." But Estrella's testimony was that his uncle told him to take Jason to the doctor as soon as he could for medical care. He did not follow that advice; instead, he waited until the next day and chose to undertake *800 a multi-hour drive to Mexico before a doctor evaluated Jason's injuries.
Estrella's own trial testimony provides legally sufficient evidence to support a reasonable jury's conclusion that Estrella failed to obtain medical care for Jason by waiting more than 12 hours to obtain any medical evaluation of his son's extensive burns.
3. Evidence that the delay caused a serious bodily injury
Estrella next argues that there is legally insufficient evidence that the delay in treatment caused a serious bodily injury.
The certified paramedic who initially saw Jason and transported him to the hospital testified that the scarring on Jason's hip indicated to him, based on his training and experience, that it was very painful, required immediate medical attention, and could not have been adequately cared for at home.
Dr. Shah, the pediatric emergency physician, testified that Jason's hip burn was severe would have caused "significant pain." In his medical opinion, such a severe burn would have required immediate medical attention as well as follow-up medical care with physicians.
Dr. Shah explained why the location of the burn increased the need for immediate and more thorough medical care. He testified that a burn that occurs at a joint in the body or where the skin is pulled due to regular bodily movement is more painful, more difficult to treat, and requires more extensive monitoring:
Burns that occur over joints are higher risk locations because as a burn is healing the skin can get tight. And so it's important that a patient who has a burn over a joint have follow-up [ ] over time, usually we'll refer them to a plastic surgeon to monitor wound healing to make sure that their joints aren't getting tight.... So we would consult our plastic surgeon to evaluate it and to also ensure follow-up after they get discharged from the hospital to monitor wound healing over time. We would make sure that the wound is clean, because burns are at risk for becoming infected.
Additionally, because the burn was near Jason's genital area, it added an extra layer of risk and required transfer to a burn center, beyond what even Texas Children's Hospital could provide.
Dr. Isaac, the Texas Children's pediatrician who took over Jason's care after he was transferred from the emergency center, agreed with Dr. Shah's assessment. In Dr. Isaac's medical opinion, the scars indicated that the burn was "quite severe" and "quite painful." It would have require extensive medical care because it was in a joint-area on Jason's body-an area that would have been subjected to frequent movement. "And because ... it's the hip joint, that skin contracts and moves and so the healing might actually be quite prolonged and protracted ... taking a long time for it to heal because of the movement of the skin in that particular area."
According to Dr. Isaac, treatment should have included ointments, antibiotics, pain management with localized numbing, and oral medications. The dressing should have been changed regularly and, due to the area of the burn, a plastic surgeon and burn specialist should have been consulted to promote proper healing and maximize future functionality. A burn like this would require multiple follow-up appointments to monitor the skin's healing in this high-movement area.
According to Dr. Isaac, it was not reasonable to wait until the next day to seek medical treatment for a burn like this or to have a child ride many hours in a car, in a seated position, while suffering from an untreated hip and groin burn.
*801 Dr. Isaac testified that the condition of Jason's scarring indicated that he had not received appropriate, timely medical attention. In Dr. Isaac's medical judgment, Jason should have been taken immediately to the closest hospital and likely transferred to a burn facility. Dr. Isaac testified that Jason has permanent scarring and a permanent disfigurement, which is a serious bodily injury.
According to Dr. Isaac, the limited treatment Jason received, as described by Jason, would have caused "unnecessary pain." Appropriate medical treatment would have focused on reducing the scarring and improving the functionality of the hip joint, and, based on the extensive scarring on Jason's hip, he did not obtain the benefits he would have received from such treatment. In other words, the scarring, which is a disfigurement, was worse than it should have been if he were to have been provided medical care at a local emergency room on the day of the burns and necessary follow-up medical care during the healing process to address skin tightening and scarring.
4. Dusek is distinguishable
Estrella likens this case to what occurred in Dusek v. State , in which the Austin Court of Appeals reversed a conviction for failure to obtain medical care for a young child. 978 S.W.2d 129, 133-37 (Tex. App.-Austin 1998, pet. ref'd). In Dusek , the defendant-mother took her son to an emergency room within a couple hours of her fiancé breaking the boy's leg. Id. at 131-33. The doctor determined that the child had multiple health problems, including a broken leg. Id. at 131. A nurse believed that the mother's implausible explanation suggested abuse. Id. The mother was charged with multiple injury-to-a-child offenses, including failure to obtain medical care for the broken leg. Id. at 132.
To convict on that offense, the jury had to find beyond a reasonable doubt that the boy suffered a serious bodily injury to his leg because his mother did not provide medical care. Id. at 133. The jury convicted the mother. Id. at 132. But, on appeal, the Austin court concluded that there was legally insufficient evidence that the denial of medical care caused a serious bodily injury and reversed that particular conviction. Id. at 133. According to the appellate court, there was no evidence that
• the mother failed to obtain medical treatment for the broken leg ;
• any omission on her part aggravated the seriousness of the injury;
• the leg had been broken for an unusual period of time;
• treatment had been delayed; or
• recovery was in any way hindered by a delay in receiving medical care.
Id.
Here, by contrast, there was evidence of a delay in treatment. The physicians testified that such a severe burn would require immediate treatment. The uncle in Mexico, according to Estrella, instructed that Jason be taken to a doctor as soon as possible. And Estrella's wife testified that she recognized Jason should have been taken to a nearby hospital. Nonetheless, Estrella waited until the next day to obtain medical care-including pain management-and decided to drive 350 miles to see a doctor in Mexico instead of visiting a nearby hospital or urgent care facility. Estrella and his wife never took Jason for a follow-up medical appointment, which denied him any medical monitoring for skin tightening in the hip joint, excessive scarring, or related unresolved pain.
There also was evidence that his recovery was hindered. The physicians testified that the extreme state of scarring indicated that the burn had not been appropriately treated and had not appropriately healed. They recounted what care should *802 have been administered and opined that, because the burn was so extensively scarred, adequate care was not provided. From this testimony, there is legally sufficient evidence that Jason's disfigurement was worse than it would have been with appropriate treatment.
Viewing the evidence in the light most favorable to the verdict, we hold that the jury rationally could have determined that Estrella's failure to obtain appropriate medical treatment for Jason on the day he was burned caused serious bodily injury, including additional disfigurement, beyond what would have occurred with proper treatment. We therefore conclude that the evidence satisfies the Jackson standard for legal sufficiency. See Jackson , 443 U.S. at 318-20, 99 S.Ct. 2781 ; Brooks , 323 S.W.3d at 895.
Accordingly, we overrule Estrella's evidentiary sufficiency issues.
Charge Error
Estrella contends the trial court committed several charge errors.
A. Standard of review
We review for charge error in two steps. First, we determine whether error exists. If it does, then, second, we evaluate whether sufficient harm resulted from the error to require reversal. Price v. State , 457 S.W.3d 437, 440 (Tex. Crim. App. 2015) ; Ngo v. State , 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the error was preserved in the trial court. See Almanza v. State , 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). If the jury charge error was properly preserved, reversal is required if the appellant has suffered "some harm" from the error. Vega v. State , 394 S.W.3d 514, 519 (Tex. Crim. App. 2013).
B. Inclusion of term "timely" in the manner-and-means description in the court's charge
Estrella asserts that the trial court erred by including the term "timely" in the manner-and-means portion of the jury charge's instruction on the offense of injury to a child by failing to obtain medical care. The manner and means were described as "failing to seek and provide timely and necessary medical attention to the complainant." Estrella notes that he objected to the inclusion of the term "timely" during the charge conference, that the trial court overruled his objection, and that the jury submitted a written question to the court during its deliberations that asked for assistance in understanding "the issue of 'timely' on the charges...." He argues that it was error to include the term in the charge because it is nowhere in the injury-to-a-child statute that he was convicted of violating.
The State responds that injury to a child is a result-oriented offense that does not list specific manner and means in the statute establishing the offense; therefore, the manner and means of committing the offense as described in the jury charge does not have to track any statutory language, is not an element of the offense that must be proven, and does not require jury unanimity.
1. Injury to a child is a result-of-conduct offense that does not specify any statutory manner and means to be proven
There are three general categories of criminal offenses: result of conduct, nature of conduct, and circumstances of conduct. Young v. State , 341 S.W.3d 417, 423 (Tex. Crim. App. 2011). Injury-to-a-child is a result-of-conduct offense. Stuhler v. State , 218 S.W.3d 706, 718 (Tex. Crim. App. 2007). Because injury to a child is a result-of-conduct offense, the focus is on *803 "the resulting injury that the conduct caused," not how it happened. Id. ; see Jefferson , 189 S.W.3d at 315 (Cochran, J., concurring).
"[T]he legislature did not predicate criminal liability for injury to child on the specific act the defendant performed. It is enough, for purposes of criminal liability, that the defendant did 'something' or failed to do 'something,' and that act, whate'er it may be, caused serious bodily injury." Jefferson , 189 S.W.3d at 315 (Cochran, J., concurring). Therefore, it "really doesn't matter, for purposes of criminal liability, how he did it." Id. By comparison, the Penal Code provisions for some nature-of-conduct offenses (like sexual-assault offenses) do specify manner and means that must be proven. See Young , 341 S.W.3d at 424 ; compare TEX. PENAL CODE § 22.021 (aggravated sexual assault) with id. § 22.04 (injury to child).
While all elements of the offense of injury-to-a-child must be proven beyond a reasonable doubt to convict, the adverbial phrases that describe how the offense occurred, i.e., the manner and means of committing the offense, which generally are introduced by the preposition "by," are not the gravamen of the offense and are not elements on which the jury must be unanimous. Huffman v. State , 267 S.W.3d 902, 905 (Tex. Crim. App. 2008) ; Stuhler , 218 S.W.3d at 718.
2. Inclusion of term "timely" was not error
Estrella does not argue that the trial court erred by specifying a manner and means in its charge. Instead, he argues that the trial court erred by describing the manner and means through "the addition of an extra word not contained in the penal code" in Section 22.04.
But there are not any manner and means specified in Section 22.04. See TEX. PENAL CODE § 22.04. By necessity, any description of a manner and means must include extra words not contained in Section 22.04. The statute simply provides no guidance or limitation on how the manner and means can be described in the court's charge.
We have reviewed cases involving injury to a child by failing to obtain medical treatment in which some medical treatment was provided. In those cases, the focus of the analysis is on the length of delay in treatment and whether the delay hindered recovery. See, e.g. , Dusek , 978 S.W.2d at 133. Implicit in the analysis is whether the delay was too long. See id. An analysis focused on length of delay is not inconsistent with use of the term "timely" to convey that medical care was obtained and then to ask whether the medical care was delayed such that the delay harmed the child. Cf. Wensel v. State , No. 08-10-00051, 2011 WL 4529774, at *1, 5-6 (Tex. App.-El Paso Sept. 30, 2011, no pet.) (mem. op., not designated for publication) (in injury-to-a-child case in which manner and means was described in indictment as "failing to provide care" and evidence supported conclusion that defendant waited until child's body was "lifeless" before emergency medical care was obtained for injuries alleged to have occurred only minutes or hours earlier, holding that "jury could have rationally concluded that [defendant]'s failure to obtain timely medical care caused [child]'s serious bodily injury"). The timeliness aspect is further reinforced through a second phrase in the same manner-and-means description-"necessary medical attention"-which Estrella did not object to. That phrase imputes its own temporal limitation because a failure to provide necessary medical care includes failure to act timely, given that a delay of necessary care is reasonably expected to result in harm. Cf.
*804 Spradling v. State , 773 S.W.2d 553, 555, 557 (Tex. Crim. App. 1989) (in analyzing criminal offense of failure to stop and render aid, noting that "perceived harm" addressed by statute that requires drivers who have car accidents to assist those injured if medical treatment appears "necessary" is that injuries might result from "delay in receiving medical assistance") (quoting State v. Hartnek , 146 Wis.2d 188, 430 N.W.2d 361, 364 (1988) ).
Because the trial court's ability to describe in its charge the manner and means of committing the offense of injury to a child is not restricted to only those terms found in Section 22.04, we reject Estrella's argument that the inclusion of the word "timely" in the charge without it being found in the statute is error. Moreover, timeliness is implicit in the analysis of injury to a child by failing to provide medical care when the evidence establishes that medical care was eventually provided and the jury is asked to determine whether the delay in care caused serious bodily injury.
C. Exclusion of statutory defenses
Estrella was convicted of injury to a child by omission for failing to obtain medical care. A person commits this offense if he "by omission, causes to a child ... serious bodily injury." TEX. PENAL CODE § 22.04(a)(1). Estrella contends that the trial court erred by not including certain defenses in its charge found in Section 22.04(k) of the Penal Code. That subsection provides that it is a "defense to prosecution under this section that the act or omission consisted of: (1) reasonable medical care occurring under the direction of or by a licensed physician; or (2) emergency medical care administered in good faith and with reasonable care by a person not licensed in the healing arts." Id. § 22.04(k). According to Estrella, he was entitled to have these defenses included in the court's charge because the evidence "gave rise to such defenses." We disagree.
1. Subsection (k)(2) is an inapplicable "confession and avoidance" defense
The defense found in Subsection (k)(2), concerning emergency medical care administered in good faith, is commonly referred to as the "Good Samaritan" defense. See Shaw v. State , 243 S.W.3d 647, 658-59 (Tex. Crim. App. 2007). It is a defense of confession and avoidance. See ids="8398004" index="65" url="https://cite.case.law/sw3d/243/647/#p658">id. at 659. Confession-and-avoidance defenses do not negate any element of an offense, including intent; instead, they excuse what would otherwise constitute criminal conduct. Id. The Good Samaritan defense "deal[s] with justifying otherwise-harmful conduct toward a child on the grounds that the conduct was in the best medical interest of the child." Cornet v. State , 359 S.W.3d 217, 225 (Tex. Crim. App. 2012) (discussing two confession-and-avoidance defenses: Good Samaritan defense and medical-care defense).
With confession-and-avoidance defenses, like this one, "a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." Shaw , 243 S.W.3d at 659 ; see Juarez v. State , 308 S.W.3d 398, 401-03 (Tex. Crim. App. 2010) (discussing confession-and-avoidance doctrine with respect to affirmative defenses of necessity, self-defense, and Good-Samaritan defense).
The doctrine requires a defendant to first admit that he engaged in the proscribed conduct by admitting all elements of the underlying offense, then claim that his commission of the offense is justified because of other facts. See Shaw , 243 S.W.3d at 659. "If the defensive evidence *805 does no more than attempt to negate an element of the offense, a defendant is not entitled to a defensive instruction on any defense that is subject to the doctrine of confession and avoidance." Villa v. State , 417 S.W.3d 455, 462 (Tex. Crim. App. 2013).
Estrella did not admit the elements of the offense of injury to a child by omission and then present the Good Samaritan defense as a justification. Instead, his defensive theory was to negate various elements of the offense, including the omission itself. Estrella argued there was no omission because he obtained medical care for Jason. This confession-and-avoidance defense has no application under these facts in light of Estrella's defensive theory and evidence. See Cornet , 359 S.W.3d at 225.
2. Subsection (k)(1) has no evidentiary support
The defense found in Subsection (k)(1) concerns "reasonable medical care occurring under the direction of or by a licensed physician." TEX. PENAL CODE § 22.04(k)(1). Estrella argues that he was entitled to have this defense presented to the jury because he provided reasonable medical care to Jason under the direction of his uncle, who, he asserts, is a licensed physician in Mexico. We disagree. Through his own testimony, Estrella established that he did not do as his uncle advised.
Estrella testified, "My uncle, Dr. Jose, he informed me to take my son as soon as I could."[7] Estrella testified that he did otherwise, waiting until the next day and electing to drive to a clinic over 350 miles away instead of going to a neighborhood emergency room or urgent care facility. When pressed on his failure to do as his uncle advised, Estrella conceded that he should have taken Jason to a nearby physician.
Even assuming that Estrella's uncle is a "licensed physician"-though the uncle did not testify and no documentary evidence established his professional licensure-Estrella's actions do not match his uncle's alleged instruction to take Jason to the doctor as soon as possible. Cf. Williams v. State , No. 05-13-00224-CR, 2014 WL 1512480, at *6 (Tex. App.-Dallas Apr. 17, 2014, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's argument that trial court erred by omitting Subsection (k)(1) defense from court's charge, concluding that evidence of caregiver's actions did not match medical instructions caregiver received). There is no evidence to support inclusion of this defense in the court's charge; therefore, the trial court did not err by omitting it.
We overrule Estrella's contention that the trial court erred by excluding the Section 22.04(k) defenses from it charge.
Prior Inconsistent Statement
Next, Estrella contends that the trial court erred by not permitting him to cross-examine Jason on a prior inconsistent statement to impeach Jason's credibility and establish a motive for fabricating a claim that he had been denied food by his father.
A. Standard of review
We review a trial court's decision to admit or exclude evidence for an abuse of discretion. Green v. State , 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996). An abuse of discretion occurs when the trial court's ruling falls outside the zone of reasonable disagreement. Id. at 102. "If *806 the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment." Sauceda v. State , 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).
B. The cross-examination of Jason
Estrella's counsel cross-examined Jason about whether he had once told Estrella, on the phone, that his biological mother was denying him access to food and water and locking him in a closet. Jason unequivocally denied making those statements:
Defense counsel: And did you call your dad up on the phone and tell your dad that they weren't feeding you and that they locked you in a closet?
Jason: I called him, but I never said that.
Defense counsel: You never said that you were locked in a closet or not being fed or have anything to drink?
Jason: No. What closet would I get locked in?
Defense counsel: I'm not sure, to be honest.
Jason: I called him, but I never said that.
Cross-examination continued without circling back to that topic. After direct and cross-examination, and parties passed the witness, and Jason was released by the court, presumably to return to his new home with his mother in Brownsville.
Later in the trial, Estrella sought to recall Jason to cross-examine him on the same topic "for the purpose of impeachment testimony." Estrella submitted a bench memo on the topic of "recalling excused witness." Estrella also submitted a bench memo on the topic of "prior inconsistent statement of complainant and witnesses to prove the inconsistent statement," in which he argued that four other witnesses would testify that they heard Jason tell his father, years earlier, that his biological mother was denying him food and water and locking him in a closet.
C. Error not demonstrated
Estrella argues that the trial court erred by not allowing him "to fully cross-examine" Jason. We fail to see how Estrella's cross-examination of Jason on this issue was limited by the trial court. Estrella asked Jason if he had ever made such accusations about his mother to his father, and Jason unequivocally denied that he had. Seeing no indication that Estrella was unable to cross-examine Jason on the issue and no offer of proof reflecting the proposed cross-examination of Jason and the anticipated responses by Jason, we conclude there was no error.[8]
State's Election of Injury for which It Sought to Convict for Failure to Obtain Medical Care
In Estrella's final issue, he contends that the trial court erred by permitting the State to specify late in the trial on which injury-the hip and groin burn-it was basing the offense of failure to obtain medical care.
1. Estrella did not object
After the State's last witness but before it rested, the State informed the trial court that it intended to specify a particular injury for which it would seek conviction under the offense of injury to a child by failing to seek medical attention. The record indicates that the State provided a copy of the State's "election" to Estrella at that time.
As the State described what it intended to do, the trial court asked both defendants if they had anything to add. Estrella's *807 co-defendant-his wife-stated through counsel, "I just object generally, but outside of that, no." Estrella did not join the general objection or make a separate objection.
The jury was then brought in, and the election was read aloud. In it, the State specified that it sought to convict Estrella of injury to a child by failing to obtain medical care only for the injury Jason suffered to his hip, and no other bodily injury. After the election was read, the State rested. Neither Estrella nor his co-defendant objected at that time. Instead, the defense called its first witness.
2. Estrella has not preserve an allegation of error for review
Appellate Procedure Rule 33.1 governs the preservation of complaints for appeal. It provides in part:
(a) In General. As a prerequisite to presenting a complaint for appellate review, the record must show that:
(1) the complaint was made to the trial court by a timely request, objection, or motion that:
(A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context....
TEX. R. APP. P. 33.1(a)(1)(A).
Rule 33.1 ensures that trial courts are provided the opportunity to correct errors before a case is appealed. Vidaurri v. State , 49 S.W.3d 880, 886 (Tex. Crim. App. 2001). If a defendant fails to inform the trial judge of a potential error through a "timely request, objection, or motion," there is no opportunity for correction at the trial level. Id. This is the reason that defendants must object to alleged errors on the record before those errors may be appealed. Id. ; see Dunn v. State , 819 S.W.2d 510, 524-25 (Tex. Crim. App. 1991) (discussing the importance of specific objections as required under Rule 52, predecessor to Rule 33.1 ).
Estrella made no objection. Even if we were to consider his wife's general objection as applying for his benefit, that objection was vague and failed to inform the trial court of its supposed error. We therefore hold that Estrella has waived any allegation of error as it relates to the election.[9] We overrule Estrella's final issue.
Conclusion
We affirm.

See Tex. Penal Code § 22.04(a).

Estrella was tried alongside his wife, who is Jason's step-mother. She also was convicted of two counts of injury to a child. She is not a party to this appeal.

There was evidence that Jason weighed a similar amount when he visited a pediatrician in Brownsville at age six.

There was conflicting evidence on whether Jason had Medicaid. Estrella testified that he did not even though the other children did. His step-mother testified that she was informed Jason's Medicaid would be discontinued because he was not closely related to her and, in anticipation of that discontinuation, she canceled his coverage. But there was other evidence that Jason had Medicaid at all relevant times, including the day he was burned.

The uncle did not testify at trial. There was no evidence that the uncle held a medical license beyond Estrella's testimony.

The emergency room pediatrician, Dr. Shah, testified that a child who presents with suspected child abuse at the hospital where he practices medicine would be referred to Child Protective Services.

The treating physicians who testified at trial also stated that the severity of Jason's burns required immediate emergency medical care.

Estrella does not contend that it was error to disallow the other four witnesses to testify so that they could contradict Jason's assertion.

We note the State's contention that any error as it relates to the election, even if not waived, would be harmless because the indictment did not specify an injury on which the State would seek conviction, Estrella did not seek to require the State to specify an injury, and the State's subsequent, sua sponte election narrowed the path it could use to obtain conviction, which was to Estrella's advantage.