In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00302-CR**
**NO. 09-24-00303-CR**
_____

**JAYLIN JEVON LEWIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause Nos. F22-40196 and F22-40197**

**MEMORANDUM OPINION**

In these two cases, Appellant Jaylin Jevon Lewis appeals his convictions for injury to a child, a first-degree felony. *See* Tex. Penal Code Ann. § 22.04(a)(1), (e). In each case, Lewis complains about a double jeopardy violation and improper jury argument during punishment. Since Lewis's two offenses for injury to a child resulted in two separate and distinct injuries and the State's jury argument

1

concerning parole law was not improper, we affirm the trial court's judgments in trial cause numbers F22-40196 and F22-40197.

## PERTINENT BACKGROUND

In trial cause number F22-40196, the grand jury indicted Lewis for violating the injury-to-a-child statute, alleging that Lewis:

> did then and there, intentionally or knowingly, by omission, cause serious bodily injury to [Ken],[1] a child fourteen years of age or younger, by failing to provide food to [Ken], and the Defendant had assumed care, custody, or control of [Ken], and during the commission of the charged offense, the Defendant used or exhibited a deadly weapon: to-wit: a padlock, which in the manner of its use and intended use is capable of causing serious bodily injury or death[.]

*See id.* § 22.04(a)(1).

In trial cause number F22-40197, the grand jury indicted Lewis for violating the injury-to-a-child statute, alleging that Lewis:

> did then and there, intentionally or knowingly, by omission, cause serious bodily injury to [Ken] a child fourteen years of age or younger, by failing to provide medical care to [Ken], and the Defendant had assumed care, custody, or control of [Ken], and during the commission of the charged offense, the Defendant used or exhibited a deadly weapon: to-wit: a padlock, which in the manner of its use and intended use is capable of causing serious bodily injury or death[.]

*See id.*

---

[1] We use pseudonyms for the names of the child and his family members to protect their rights to privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

The trial court conducted a jury trial. Jacob Paul Rodriguez with the Port Arthur Fire Department testified that he responded to a call on May 31, 2022, and found three-year-old Ken lying on the floor looking "kind of emaciated." Rodriguez explained that Ken had no pulse, was not breathing, and had early signs of rigor mortis and had been deceased too long to resuscitate him. Rodriguez testified that Ken's sister and a male were present and reported Ken was alive the night before but had food intake issues. Rodriguez learned that Ken's mother had left him in his sister's care for an unknown amount of time.

Captain James Barbay of the Port Arthur Fire Department also responded to the scene and explained that Ken's sister reported that Ken had Down Syndrome and poor health and that Ken's mother had been neglecting him. Barbay testified that when he arrived, he observed a male, who he assumed was Ken's sister's boyfriend, performing chest compressions and then the boyfriend packed a bag and left before the police arrived. Barbay explained that the scene was "very awkward[,]" and he didn't feel that anybody was upset. Barbay testified that Ken was "very malnutrition[,]" and Ken's sister, who reported having Ken for about a month, blamed Ken's mother for neglecting him. Barbay believed that Ken had not received proper care.

Kayla Taylor with Acadian Ambulance testified that when she responded to the scene, she observed Ken was "very emaciated and looked very unwell." Taylor

3

testified that she advised to cease resuscitation efforts due to Ken having rigor mortis to his jaw. Taylor stated that Ken's sister reported that when she told Ken's mother that Ken had been sick and losing weight, Ken's mother told her he just needed milk and vitamins.

Officer Bao Tran with the City of Port Arthur testified that when he arrived on scene, he observed a black male, whom he identified as Lewis, leaving the scene and medical personnel trying to resuscitate Ken, whose ribcage was very visible. Tran described Ken's sister as hysterical and Ken as "very malnourished." Tran testified that Ken's sister reported she was helping her mom with Ken, whom she claimed to have had for a few weeks and about a month. Tran testified that Ken's sister reported telling Ken's mother that Ken was not eating, but Ken's mother claimed that was normal for him. Tran explained that Ken's sister said Ken was perfectly fine the night before Tran arrived. Tran explained there were three other children at the scene who were living in deplorable conditions and reporting being hungry. Tran testified that in the bedroom where Ken was found, there was a door, which he assumed was a closet, padlocked with a red-colored lock. Tran explained when they pried the door open, they smelled a foul smell like urine and found toys and a makeshift bed with a soiled bedsheet. The jury viewed photographs of Ken from the scene and the closet with the padlock and Tran's body camera video. Tran testified the photographs showed Ken appeared to be "severely starved."

4

Officer Mickey Sterling with the Port Arthur Police Department testified that Ken's sister reported that Ken's mother had been his primary caregiver and that they had trouble feeding Ken, who didn't like some foods. Sterling explained that Ken's sister reported that Ken's mother had been dodging Child Protective Services and hiding the three children at different residences. Sterling testified that Ken's mother came to the scene.

Detective Brian Cater with the Port Arthur Police Department testified that he extracted data from a cell phone and prepared a report, which was entered into evidence.

Kathy, Ken's sister, testified that she was residing with her boyfriend, Lewis, when her mother, Ken, and her other two siblings came to stay with them. Kathy explained that her mother would leave for weeks at a time and leave the children. Kathy testified that Lewis helped her care for the children, and he had care, custody, and control over the children when he was alone with them during an approximate six-month period. Kathy testified to her cell phone number, which matches the cell phone that is the subject of Detective Carter's report, and she explained that Lewis was saved in her cell phone as "Babe[.]" The State questioned Kathy about the text messages in the report, some of which show Kathy and Lewis discussing the location of Ken's bottle the month prior to his death. The text messages show that Lewis responded that Ken's bottle was in the closet. The text messages also show Lewis

5

told Kathy Ken was having seizures the month of his death, and Kathy testified that Ken had a seizure a few times and they never sought medical attention. Kathy explained that another message showed she begged Lewis to take Ken out of the closet, where Lewis had put Ken on several occasions when Ken was under his control.

Kathy explained that during the six months Ken was staying with them, his weight went up and down, but when it declined, they never sought medical attention or treatment. Kathy testified that she had taken responsibility and pled guilty for her involvement in Ken's death and received thirty years of confinement. Kathy agreed that she should have sought help for Ken and that Lewis had told her a few times that she needed to get help because something was wrong. Kathy explained Ken was in the closet because she and Lewis fought, and he wanted the children to leave. Kathy claimed she never saw the padlock on the closet door. Kathy testified there were some days when Ken would not eat, and she did not know why.

Dr. Baiyang Xu, a forensic pathologist, testified he reviewed Ken's autopsy report, which shows Ken was very thin and the level was so severe the fat tissue in the underlying skin was gone and the skin directly covered the bone. Xu explained that Ken's ribcage and spine were protruding, and the body was "early decomposed." Xu testified that the body features showed it had been two or three days since Ken's

death. Xu explained the report showed Ken's upper and lower extremities were atrophic and there was maggot activity in his external genital area.

Xu testified that Ken's cause of death was severe malnutrition with acute bronchopneumonia, and he explained Ken's manner of death was a homicide and that death is a form of serious bodily injury. Xu testified that severe malnutrition is a byproduct of not providing Ken with adequate food, and he explained that Ken's "very severe malnutrition[]" does not happen instantly or overnight. Xu explained that it was unlikely that Ken's Down Syndrome influenced his ability to eat or weight fluctuations. Xu explained that malnutrition is a risk factor for infections because severe malnutrition decreases the function of the immune system. Xu opined that Ken's bronchopneumonia is largely related to the malnutrition, and his bronchopneumonia was acute, meaning the timing was one or two weeks. Xu testified that medical intervention, had it been sought early enough, could have potentially saved Ken.

Lewis testified in his defense and explained he knew something was wrong with Ken because of his weight. Lewis testified he was concerned about Ken because he did not improve, and he expressed his concerns to Kathy multiple times. Lewis testified he did not know Ken was not eating because he was "never around really" when Kathy fed the children. Lewis knew Ken was having seizures and told Kathy to seek medical help, but he never sought help for Ken even though he thought about

7

it because he did not want his child taken away. Lewis testified that Kathy told him the children were her responsibility and not Lewis's. Lewis explained that the morning Kathy found Ken unresponsive, he gave Ken CPR until help arrived and then went to work. Lewis testified he got scared when Kathy and her mom were arrested and was on the run for nearly a month, because he did not want to go back to jail for something that happened in his household. Lewis admitted he had a padlock on his closet, which he used as a storage room and place for his puppy to sleep. Lewis denied locking Ken in the closet, and he claimed that Kathy begged him to take the puppy out of the closet.

In each case, a jury found Lewis guilty of injury to a child and assessed Lewis's punishment at 60 years of confinement.

## ANALYSIS

In issue one, Lewis argues his convictions and sentences from his consolidated trial violate his double jeopardy rights under the United States and Texas Constitutions because he was convicted of the same offense, under the same statute, upon the same victim, on the same date, varying only in the manner and means of committing the offense. *See* U.S. CONST. amend V; Tex. Const. art. I, § 14. The State counters that in each case, Lewis failed to preserve this issue for our review or, alternatively, that Lewis failed to show there are double jeopardy violations clearly apparent on the face of the records. We agree with the State.

8

A person commits the offense of injury to a child if he "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child[]" serious bodily injury. *See* Tex. Penal Code Ann. § 22.04(a)(3). For purposes of an injury-to-a-child by omission offense, an omission that causes a child to suffer serious bodily injury is conduct constituting an offense if the actor has a legal or statutory duty to act. *Id.* § 22.04(b)(1); *see Estrella v. State*, 546 S.W.3d 789, 795 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd); *Williams v. State*, 294 S.W.3d 674, 684 (Tex. App.— Houston [1st Dist.] 2009, pet. ref'd) (op. on reh'g).

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). It is therefore not enough for the State to prove that the defendant engaged in the alleged conduct with the requisite criminal intent; rather, it must prove that the defendant caused the result with the requisite criminal intent. *Estrella*, 546 S.W.3d at 795. A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Pen. Code Ann. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). The particular result at issue in these two cases is "serious bodily injury." "Serious bodily injury" means "bodily injury that creates a

9

substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

*Preservation of Double Jeopardy Claim*

As a general rule, a party must preserve a complaint for appellate review by making a timely and specific objection, motion, or request in the trial court. *See* Tex. R. App. P. 33.1. A potential multiple-punishment double jeopardy claim may be forfeited if the defendant does not properly preserve the claim by raising it in the trial court. *Langs v. State*, 183 S.W.3d 680, 686 (Tex. Crim. App. 2006); *Gonzalez v. State*, 8 S.W.3d 640, 642-43 (Tex. Crim. App. 2000). Requiring the defendant to preserve his multiple-punishments double jeopardy claim allows the trial court and the prosecution the opportunity to remove the basis for the objection and avoid the risk of an unnecessary retrial. *Langs*, 183 S.W.3d at 686 n.22 (quoting *Gonzalez*, 8 S.W.3d at 645-46).

A defendant may, however, raise a double jeopardy claim for the first time on appeal when the undisputed facts show that the violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interest. *Gonzalez*, 8 S.W.3d at 642-43. A double jeopardy claim is apparent on the face of the trial record if resolution of the claim does not require further proceedings to introduce additional evidence in support of the claim. *Ex parte*

10

*Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013); *Gonzalez*, 8 S.W.3d at 643. The record shows Lewis did not raise a double jeopardy objection in the trial court in either case. Instead, Lewis argues that the double jeopardy violation is clear and that he is entitled to relief based on the record alone. We disagree.

As mentioned above, injury to a child is a result-oriented offense. *See Williams*, 235 S.W.3d at 750; *Villanueva v. State*, 227 S.W.3d 744, 748 (Tex. Crim. App. 2007). "If the focus of the offense is the result—that is, the offense is a 'result of conduct' crime—then different types of results are considered to be separate offenses, but different types of conduct are not." *Huffman v. State*, 267 S.W.3d 902, 907 (Tex. Crim. App. 2008) (superseded by statute on other grounds). Whether separate legal theories are separate offenses depends upon whether the theories differ with respect to the result of the defendant's conduct. *Id.* at 905. Thus, the allowable units of prosecution are determined by how many separate and discrete statutorily defined types of injurious results the defendant's act or conduct caused. *Nawaz v. State*, 663 S.W.3d 739, 745, 747 (Tex. Crim. App. 2022).

The Court of Criminal Appeals has held that it is permissible to convict a defendant for two violations of the same statutory provision on the same day if the State can prove that two separate and discrete incidents occurred comprising two violations of the same statutory offense. *Villanueva*, 227 S.W.3d at 748-49 (citing *Luna v. State*, 493 S.W.2d 854, 855 (Tex. Crim. App. 1973)). The *Villanueva* Court

11

explained that as it held in *Luna v. State*, a failure to seek treatment for injuries could reasonably result in a "separate and discrete, or at least incrementally greater, injury for which the appellant could also be held criminally accountable without violating double jeopardy." *Id.* at 749. The *Villanueva* Court explained that when a victim's condition is obviously deteriorating, and it is apparent that the victim might suffer further serious bodily injury absent medical interventions, the *Luna* principle could apply. *See id.* Since these cases include evidence that Lewis's failure to provide food caused Lewis to suffer serious bodily injury and that Lewis's failure to provide medical care to Ken caused Ken to suffer further serious bodily injury, the *Luna* principle applies, and Lewis could be convicted for two violations of the same statutory provision without violating double jeopardy. *See id.* at 748-49; *Luna*, 493 S.W.2d at 855. In *Luna*, the court explained that Luna committed two separate offenses when he made a purchase of heroin on February 19, 1970, and on May 4, 1970, even though he was convicted of the May 4th purchase before he was prosecuted for the February 19th purchase.

The State charged Lewis with two violations of the injury-to-a-child statute–1) failing to provide food and 2) failing to provide medical care–which the evidence shows resulted in separate and distinct injuries to Ken. *See Villanueva*, 227 S.W.3d at 748-49; *Luna*, 493 S.W.2d at 855. The jury heard that Ken's cause of death was severe malnutrition with acute bronchopneumonia. Concerning the failure to provide

12

food, the jury heard Ken's severe malnutrition did not happen overnight and was a byproduct of not being provided adequate food over a period of time.

Concerning the failure to provide medical care, the jury heard testimony that the failure to seek medical care for Ken's severe malnutrition caused him to suffer an additional serious bodily injury, acute bronchopneumonia, which was largely related to his malnutrition and developed one or two weeks prior to his death. The jury heard that medical intervention could have potentially saved Ken, and Lewis admitted that although he knew something was wrong with Ken and had thought about getting him medical care, he failed to do so.

We hold the records show that Ken suffered two separate and discrete injuries, severe malnourishment, which developed over time due to the failure to provide Ken food, and acute bronchopneumonia, which developed the week or two before Ken's death and was largely related to Ken's severe malnutrition which compromised his immune system. *See Villanueva*, 227 S.W.3d at 748-49; *Luna*, 493 S.W.2d at 855. We hold the jury could have reasonably concluded that Lewis's failure to provide medical care for Ken's severe malnutrition resulted in Ken developing acute bronchopneumonia, a separate and discrete serious bodily injury for which Lewis could be held criminally accountable. *See Villanueva*, 227 S.W.3d at 749.

Based on the records in these cases, we conclude that Lewis's double jeopardy rights were not violated by the State having charged him with two separate offenses

13

of injury to a child by omission that resulted in separate and distinct injuries. Since Lewis failed to show double jeopardy violations are apparent on the face of the records, we overrule Lewis's first issue in each case.

In issue two, Lewis contends the State engaged in improper jury argument during the punishment phase of trial by encouraging the jury to consider the application of parole law as it applied to him. His complaint pertains to the following argument:

> No matter -- whatever amount of time you sentence this defendant to in prison, there is the possibility -- it's in the jury charge - - that he will be eligible for parole in about half of that time, okay? It's in the charge. Don't take my word for it. You can read it. You can't bank on that, but the charge says you can consider that. Let's say, for instance, you sentence this defendant to 50 years in prison. He is eligible for parole -- or could be eligible for parole at 25 years, okay? So, in 25 years, this -- either 25 years or 30 years, whichever is the least amount of time. But by -- for the most part, I want [] you to consider the fact that he would be eligible for parole in about -- or could be in about half that time, which means in 25 years, he's back out and he can eat and live and do the things –

Defense counsel objected that the State's closing argument was improper because the jury is not allowed to consider the manner in which the parole law may be applied in this particular case. The State explained it was only stating that Lewis may be eligible for parole. The trial court overruled defense counsel's objection, finding that the jury may consider the possibility of parole. The State then argued that the jury could consider that in "25 years, he could be out walking around, you

14

know, living his life. Death sentence versus couple decades in prison. So, again, I would consider that as part of the aggravating factors that you consider."

Article 37.07, § 4(a) of the Texas Code of Criminal Procedure requires that the jury be given certain instructions about parole eligibility, including: "It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities[,]" and "You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant." *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a). "Consequently, it is improper for a prosecutor to apply [parole] law to the defendant on trial during jury argument." *Perez v. State*, 994 S.W.2d 233, 237 (Tex. App.—Waco 1999, no pet.). That said, it is not improper for a prosecutor to "accurately restate the law given in the jury charge" or "to ask the jury to take the existence of that law into account when assessing punishment." *Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004).

In each case, the trial court's jury charge instructions during punishment instruct the jury that it may consider the existence of the parole law but may not consider the manner in which it may be applied to this particular defendant. The punishment charge also explains that the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed. We

15

cannot conclude that the State's argument was improper. Instead, it was an accurate restatement of the parole law. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a); *Hawkins*, 135 S.W.3d at 84. The argument did not apply parole law to Lewis specifically, nor did it encourage the jury "to consider the manner in which the parole law may be applied to" him. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a); *Perez*, 994 S.W.2d at 237. Rather, the State's argument sought to merely explain the parole-law instructions in the punishment charge and how the jury could consider the existence of the parole law and how the defendant could be eligible for parole in about half the time of the sentence it imposed. Since the State's argument concerning parole law was not improper, we overrule Lewis's second issue in each case.

Having overruled both of Lewis's issues in each case, we affirm the trial court's judgments in trial cause numbers F22-40196 and F22-40197.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on November 12, 2025
Opinion Delivered December 10, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.

16