**Affirmed and Opinion filed January 7, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-01082-CR

---

**TAMMI BLEIMEYER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1458861**

---

## OPINION

A jury found appellant guilty of injury to a child and assessed punishment at twenty-eight years' confinement. She challenges her conviction and punishment in nine issues, contending that (1) the evidence is insufficient to support her conviction, (2) the trial court failed to submit a charge on a lesser-included offense, (3) the trial court erred by excluding and admitting evidence, (4) fundamental error resulted from the State's argument during punishment, and (5) cumulative error made her trial fundamentally unfair. We affirm.

# I.     SUFFICIENCY OF THE EVIDENCE

We address appellant's sufficiency issue first.  *See, e.g.*, *Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.).  In her ninth issue, appellant contends that the evidence is insufficient to support her conviction of first-degree felony injury to a child.  The indictment alleged that she intentionally or knowingly caused serious bodily injury to the complainant by omission—as alleged, by failing to seek medical attention in a timely manner, failing to protect the complainant, and failing to adequately nourish him.  *See* Tex. Penal Code § 22.04(a)(1), (e).  Appellant contends that there is insufficient evidence that (1) the complainant suffered serious bodily injury; (2) appellant assumed care, custody, or control of the complainant, as required to prove the offense by omission; and (3) appellant caused the injury with the requisite mental state.

## A.     Standard of Review

When reviewing the sufficiency of the evidence, we consider all of the admitted evidence in the light most favorable to the verdict to determine whether a rational jury could find the essential elements of the offense beyond a reasonable doubt.  *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020).  The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony.  *Id.*  Juries can draw any reasonable inference from the facts so long as each inference is supported by the evidence.  *Id.*

## B.     Serious Bodily Injury

"Bodily injury" means physical pain, illness, or any impairment of the physical condition.  Tex. Penal Code § 1.07(a)(8).  A bodily injury can be "serious" if it (1) creates a substantial risk of death, (2) causes serious permanent

disfigurement, or (3) causes protracted loss or impairment of the function of any bodily member or organ. *Id.* § 1.07(a)(46). Whether an injury constitutes a serious bodily injury is determined on a case-by-case basis. *Miller v. State*, 312 S.W.3d 209, 213 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). We consider the extent of the injury at the time it was inflicted, not after the effects have been ameliorated by medical treatment. *Id.*; *see Blea v. State*, 483 S.W.3d 29, 34–35 (Tex. Crim. App. 2016).

The State adduced testimony from a pediatrician who consulted on the treatment of the complainant at a hospital. The doctor testified that the complainant was five years old when he was brought to the hospital in March 2014. He was "terribly malnourished" and underweight. He weighed thirty pounds, which was only one pound more than the standard used by the World Health Organization to classify famine victims as "severely malnourished." He weighed about seven pounds less than he had weighed at his four-year-old checkup about ten months prior. The complainant's mother testified that when she saw him in the hospital, he was so skinny that he "looked like a Holocaust victim." He was physically unable to walk himself to the bathroom. The jury saw photographs of the complainant's emaciated body.

The doctor testified that the complainant suffered from chronic starvation— that is, starvation occurring over a prolonged period of time. Malnutrition caused the complainant's height to be stunted by about three inches. This loss of height was permanent. When he was admitted to the hospital, his liver was beginning to fail. He was at a risk for kidney failure and heart rhythm disturbances, which can cause heart attacks and the heart to stop. The complainant spent more than ten days in the hospital to recover and had to participate in physical and occupational therapy.

The doctor testified that the complainant's risk of death on the day of admission to the hospital was "moderate," but he was close to the stage where he could have died quickly. The doctor opined that the complainant suffered serious bodily injury because the complainant had a protracted loss of use of a bodily member or organ or permanent disfigurement. The doctor based this conclusion on the complainant's organ damage and permanent loss of height.

Based on this evidence—in particular, that the complainant was in the beginning stages of organ failure, his height was permanently stunted, and he had been unable to walk as a result of the malnutrition—the jury rationally concluded that the complainant suffered serious bodily injury because the complainant's chronic starvation and the lack of medical care created a substantial risk of death or caused serious permanent disfigurement or protracted loss or impairment of the function of the complainant's body or organs. *See Estrella v. State*, 546 S.W.3d 789, 797–98 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (child diagnosed with chronic starvation showed physical signs of emaciation and could not support his own weight due to physical condition); *Baldwin v. State*, 264 S.W.3d 237, 243 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (children were in "obviously malnourished condition," had persistent diarrhea, lost weight, and "stopped growing"); *Rosales v. State*, 932 S.W.2d 530, 535 (Tex. App.—Tyler 1995, pet. ref'd) (child was extremely malnourished, causing her to be lethargic and very underweight, and she would not have survived for long in her then-current nutritional state).

## C.     Assumed Care, Custody, or Control

An omission that causes serious bodily injury is conduct constituting an offense if the defendant had assumed care, custody, or control of the child. *See* Tex. Penal Code § 22.04(b). A person has assumed care, custody, or control "if he

4

has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child." *Id.* § 22.04(d). To be convicted of injury to a child by omission, a defendant need not have an *in loco parentis* relationship with the child—that is, the defendant need not assume all the duties of a parent. *Rey v. State*, 280 S.W.3d 265, 269 (Tex. Crim. App. 2009) (acknowledging that a babysitter could have at least temporary care, custody, or control of a child).

Appellant married the complainant's father, Brad, so appellant was the complainant's stepmother. Brad and the complainant moved into appellant's house with appellant and her five other children.[1] Brad and appellant testified that Brad and the complainant lived with appellant "off and on." Appellant testified that the complainant was part of the family and participated in family events. The complainant had his own bed in a room that he shared with one of appellant's sons, although appellant's eldest son testified that the complainant often slept near appellant and Brad in the living room. Appellant testified that her relationship to the complainant was similar to a nephew. The complainant called appellant "mom."

The eldest son testified that, at first, the complainant was treated fine—like the other kids. Initially, the complainant was allowed to eat meals with the rest of the family. Eventually, both appellant and Brad told the eldest son to not feed the complainant food when the complainant was "in trouble." Similarly, appellant's eldest daughter testified that both appellant and Brad told the other children that they were not allowed to engage with the complainant at all. If the children

---

[1] Later, appellant had two additional children with Brad, one of whom was born before the complainant was taken to the hospital in March 2014.

disobeyed this order, appellant and Brad would punish the complainant harsher. The eldest son testified that appellant was always in control of the household.[2]

A physician's assistant testified that the complainant's stepmother and father attended the complainant's five-year-old checkup in early 2014. The assistant testified that the stepmother answered the assistant's questions more so than the father; she was the "better historian in terms of providing information." Appellant told the assistant that the complainant was "a very good eater and that he often overeats." The assistant ordered lab work to determine the cause of the complainant's weight loss. When the assistant did not receive the lab work, her office called appellant. Appellant told them that the complainant had moved to Alabama and that she no longer had contact with him.

Appellant's longtime friend testified that she saw appellant, Brad, and the complainant in early 2014. The complainant was really skinny, and the friend was afraid the complainant would die. She told appellant that the complainant needed to go to a hospital. Appellant told the friend that the complainant was fine, and he ate all the time. The friend said, "Just give him to me, and I'll take him." Appellant did not give him to the friend.

In March 2014, the eldest son and Brad argued about the complainant's care, and they fought physically. The eldest son called the police to report the complainant's condition, and appellant gathered up the younger children, including

---

[2] For example, the eldest children described how appellant would take the thermostat off the wall when she went to work, so the heat and air conditioning only worked while appellant was home. She required all the children to use only one of the three bathrooms in the house. She would make Brad (and her ex-husbands in the past) bring all the children to her workplace and sit in the car until she got off work, including from 8 a.m. to 5 p.m. during the summers. Appellant never allowed Brad or her ex-husbands to get a job; she told one of her ex-husbands quit his job under threat that she would prevent him from having access to their child.

6

the complainant, and fled the house.[3]  A few days later, police officers found appellant, Brad, and the younger children at a motel.  The complainant was eating pizza.

Both Brad and appellant testified that Brad solely was responsible for taking care of the complainant.  Appellant's niece testified similarly, "If you wanted to do anything when it came to [the complainant], you had to ask Brad for permission." Brad testified, for example, that appellant did not help bathe the complainant; but he admitted to testifying in a prior proceeding that appellant did help bathe the complainant.  Appellant testified that she and Brad had a premarital agreement that Brad was responsible for the complainant while appellant was responsible for her children.  So, for example, appellant testified she would buy pizza for herself and her children, but she wouldn't buy pizza for Brad and the complainant.  However, appellant also testified that she had purchased food for the complainant to feed him so he would be nourished if he was hungry.

The jury could have disregarded testimony that Brad solely was responsible for the complainant's care.  Moreover, a person "need not assume exclusive 'care, custody, or control' of the child, as multiple persons may each have an individual duty to act on behalf of the child." *Proo v. State*, 587 S.W.3d 789, 806 (Tex. App.—San Antonio 2019, pet. ref'd).  Ample evidence supports the jury's finding that appellant assumed care, custody, or control over the complaint based on her acts and course of conduct that would cause a reasonable person to conclude she accepted responsibility for protection, food, shelter, and medical care.  In particular, there was evidence that the complainant moved into appellant's home, which she controlled, and he had a dedicated place to sleep. *See id.* at 807 (noting

---

[3] Appellant testified that she did not realize the complainant was in her car until after she arrived at a family friend's house.

that residence is a factor). Appellant initially treated the complainant like her own children, and they all ate together. On at least some occasions, appellant controlled when the complainant could eat and who could interact with the complainant. Appellant also participated in the complainant's medical care, prevented another person from taking the complainant to a hospital, and lied to a medical provider about the complainant's whereabouts. Days before police officers found appellant, Brad, and the complainant at a motel, appellant had taken the complainant from the house along with her other young children. This evidence supports the jury's finding beyond a reasonable doubt. *See id.* (citing *Deleon v. State*, No. 04-05-00369-CR, 2006 WL 1684637, at \*6 (Tex. App.—San Antonio June 21, 2006, pet. ref'd) (mem. op., not designated for publication) (upholding jury's finding that grandmother assumed care, custody, or control of a child because the grandmother regulated the child's food consumption, medical attention, and movement; noting evidence that the grandmother prohibited a visitor from feeding the child, prohibited the visitor from taking him for medical attention, and determined if and when the person could visit the child)).

## C. Knowingly Caused Injury

"The State must prove that a defendant caused a child's serious bodily injury with the requisite criminal intent." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). As alleged in the indictment, the State was required to prove that appellant intentionally or knowingly caused serious bodily injury to the complainant. Because the jury could have found appellant guilty based on either of these culpable mental states, we need only address the less-culpable mental state of "knowingly." *See Howard v. State*, 333 S.W.3d 137, 139 (Tex. Crim. App. 2011).

"Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams*, 235 S.W.3d at 750. Under the penal code, a person acts knowingly with respect to the result of her conduct when she is aware that her conduct is reasonably certain to cause the result. Tex. Penal Code § 6.03(b). Thus, the State must adduce evidence that a defendant was aware with reasonable certainty that the result of serious bodily injury would have been prevented had the defendant performed the act that was omitted—here, for example, seeking medical attention for the complainant or nourishing him. *See Dorch v. State*, 596 S.W.3d 871, 878–79 (Tex. App.—San Antonio 2019, pet. ref'd); *Proo*, 587 S.W.3d at 810; *Payton v. State*, 106 S.W.3d 326, 331 (Tex. App.—Fort Worth 2003, pet. ref'd).

Proof of a culpable mental state generally relies on circumstantial evidence. *Gilder v. State*, 469 S.W.3d 636, 639 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *Lane v. State*, 763 S.W.2d 785, 787 (Tex. Crim. App. 1989)); *see also Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016). Intent may be inferred from the defendant's words, acts, and conduct. *See Gilder*, 469 S.W.3d at 639.

Appellant's home had a closet in the living room near where appellant and Brad slept. Although disputed, multiple witnesses testified that there was a lock on the door. Inside the closet was a small crawlspace underneath a staircase. The walls were unfinished, and the floor was concrete. Several of appellant's children testified that the complainant would be put into the crawlspace when he was "in trouble." The complainant was constantly in trouble for six months before the events in March 2014. He was in trouble every day. The eldest son testified that he would sometimes see the complainant only once per week because the complainant would be "in trouble for so long." Appellant's eldest son saw both

appellant and Brad put the complainant in the crawlspace. Appellant's second eldest son described the crawlspace as "solitary confinement." Appellant and Brad would jokingly refer to the crawlspace as the "Harry Potter room."[4]

The eldest son testified that the complainant wasn't allowed to eat as a form of punishment. The complainant usually wasn't present during family meals. The eldest son testified, "Maybe every once and awhile they would bring him out." Even then, appellant and Brad wouldn't let the complainant eat what everyone else was eating. If anything, he was allowed a piece of bread. The eldest son testified, "And typically after they gave it to him, he ended up—they ended up taking him back because he was crying for some reason or whatever. They told him to go back in the closet." As discussed above, appellant and Brad prevented the other children from feeding and engaging with the complainant.

A social worker at the hospital that ultimately cared for the complainant in March and April 2014 testified about statements that the complainant made to her. He told her that he had been locked in a very dark closet and that, as punishment, he would be whipped with a belt and would not be allowed to eat. He indicated that both appellant and Brad inflicted this punishment.

Appellant's two eldest children testified that appellant instigated Brad's punishment of the complainant. Appellant would tell Brad to discipline and punish the complainant. And appellant would tell Brad that his punishment of the complainant wasn't harsh enough. Appellant's friend testified that appellant said the complainant caused a lot of problems because he would "wake up in the middle of the night, make messes, and eat food."

---

[4] Protagonist Harry Potter slept in a "cupboard under the stairs." J.K. Rowling, Harry Potter and the Sorcerer's Stone 19 (Scholastic Inc. 1999) (1998). Harry's caretakers would punish him by sending him to the cupboard without meals or keeping him there for a week. *See id.* at 24, 29.

Appellant's eldest daughter testified that appellant was around when Brad doled out punishments. Appellant didn't tell Brad to stop. Appellant's eldest son testified that appellant was "completely" aware of the situation. When her eldest children questioned her about the complainant, appellant would say either it wasn't their business, or she would say it wasn't happening. She convinced the eldest son that everything that was happening was normal. He described an incident when Brad slammed the complainant's head into a wall. Appellant told the son "it didn't happen." And she told him nobody would believe him. When the eldest son told someone about the abuse, and the police were called to investigate, appellant told the police that her son was lying and making it up because he didn't like Brad.

Brad testified that the complainant was in pretty poor physical condition by the time of his hospitalization, and the complainant had gotten that way over a "period of time." Although Brad testified that he was responsible for the complainant's condition, he acknowledged that appellant did not do anything about it.

Appellant testified that she could not imagine how the complainant became so skinny and malnourished. She testified that she never saw Brad withhold food from the complainant or lock him in the closet. She testified that she would be concerned if one of her children was losing weight. She acknowledged that she knew the complainant looked skinnier in January 2014, and she told Brad to take the complainant to a doctor. However, appellant denied that her friend told her to bring the complainant to a hospital due to his low weight.

The complainant's emaciated condition was obvious to those who saw him, including appellant's children and appellant's friend. The jury saw photographs of the complainant from when he was admitted to the hospital. They are consistent with the complainant's mother's description of him from that time period: "He was

literally skin and bones.  I could see his skeleton more than I could anything else."  He looked like a "Holocaust victim."

The State adduced evidence that appellant tried to hide the complainant's condition.  The eldest son testified that he ultimately told counselors, family, friends, and the police about appellant and Brad's treatment of the complainant, and he had drawn a lot of attention to it.  A Harris County Sheriff's Office deputy spoke with both of the eldest children in January 2014.  They expressed concern about the complainant.  This deputy and others did welfare checks at the home in January and February 2014.  The eldest son testified that appellant and Brad took the complainant to Ohio to hide his condition.[5]  Appellant's friend testified similarly that it was in January 2014 when appellant and Brad brought the complainant to her home and she told appellant that the complainant needed to be taken to a hospital due to his weight.  The friend testified, "I didn't think you could be that skinny and not die."

Instead of taking the complainant to a hospital, appellant and Brad took the complainant to Ohio and left him there for several weeks.  Based on the friend's conversations with appellant, the friend believed that appellant and Brad took the complainant out of state "so they wouldn't get in trouble."  In Ohio, appellant and Brad left the complainant with the godmother of several of appellant's children.

---

[5] He testified:

> My mom around that time had, I guess, taken [the complainant] up to Ohio to try to get him out of the situation because I was, I guess, at that point, I had drawn a lot of attention to what was going on by reaching out to people and putting, you know, everything that was happening at our house out there.

> She started getting worried, I guess, that people would find out about it; and they took [the complainant] away for a while to, I guess, try to get him out of the picture, get him healthy again, get him looking better.  That way if anybody came to the house looking for him, he wasn't there.

Brad testified that he was not acquainted with the godmother before leaving the complainant with her.

As discussed above, appellant made several false statements to others—her friend and the physician's assistant—about how the complainant ate well. And when the physician's assistant ordered lab work to determine the reason for the complainant's weight loss, appellant lied to the assistant's office about the complainant moving to Alabama and said she no longer had contact with him. When the police were called about the fight between Brad and her eldest son in March 2014, appellant hid the complainant from police by taking him away from the home.

Also discussed above, a doctor testified that the complainant's serious bodily injury was caused by chronic starvation. No medical evidence was presented that the complainant's injuries were caused by something other than starvation. At the hospital, the complainant was "consumed" by food—he kept asking for food. When he started eating regular food again at the hospital, he gained weight rapidly.[6] By the time of trial, the complainant was nine years old and weighed 118 pounds.

In sum, the jury heard direct evidence that (1) appellant was fully aware of, and participated in, depriving the complainant of food over a prolonged period of time; (2) appellant was aware of the complainant's weight loss and would have been concerned if her own children lost weight; (3) appellant was aware of the complainant's need for medical treatment and to eat food, yet she refused to do it and lied about it; and (4) appellant's failure to nourish the complainant or seek

---

[6] The doctor explained that the complainant was not allowed to eat regular food at first because of the risk of death associated with refeeding syndrome. When a person who has been starved is suddenly given a full meal of carbohydrates and fats—like pizza—it can cause the liver to shut down, kidneys to fail, and heart to stop.

medical intervention caused the complainant's serious bodily injury. Moreover, the jury heard of appellant's attempts to conceal the complainant's condition, which is circumstantial evidence of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Considering all of this evidence, the jury could have concluded that appellant acted knowingly because she was reasonably certain that depriving the complainant of food and adequate medical treatment would cause serious bodily injury. *See Proo* v. State, 587 S.W.3d 789, 810–13 (Tex. App.—San Antonio 2019, pet. ref'd) (five-year-old child who weighed thirty-eight pounds was severely and obviously emaciated and malnourished, such that defendant-babysitter would have noticed the obvious and apparent emaciation, supporting jury's finding that defendant knowingly caused serious bodily injury by omission; noting that photographs of the child provided "strong evidence" refuting the defendant's claim that she did not know the child needed medical attention or lacked adequate nourishment; "Eyewitness testimony concerning a child's appearance can provide evidence of the extent of a defendant's awareness and knowledge of the child's condition and need for medical care."); *Vasquez v. State*, 272 S.W.3d 667, 671–72 (Tex. App.—Eastland 2008, no pet.) (malnourished child, whose "appearance alone indicated the need for medical attention"—which the jury saw through photographs—was not allowed to eat when she wanted and was punished for attempting to do so; defendant knew that his daughter was losing weight, had been told by a relative that he needed to take the daughter to a doctor because the relative could see there was something wrong with the daughter, had been told by a doctor to make a return visit if the daughter lost weight, and lied to relatives about taking the daughter to the doctor); *Baldwin v. State*, 264 S.W.3d 237, 242–43 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) ("The attempts to

14

conceal treatment of the boys, coupled with the testimony of the hospital pediatrician concerning the severity of their malnourishment, permitted the jury to reasonably infer that [the boys] suffered serious bodily injury because [the defendant] intentionally and knowingly failed to provide them with adequate nutrition and medical care."); *see also Dorch v. State*, 596 S.W.3d 871, 886 (Tex. App.—San Antonio 2019, pet. ref'd) (defendant was aware of the children's malnourished conditions and acknowledged that they needed better care); *Hill v. State*, 881 S.W.2d 897, 903 (Tex. App.—Fort Worth 1994) (child who died of chronic malnourishment occurring over a period of several years was in poor health that was apparent to his younger brother, yet defendant-parents sought no medical treatment and failed to nourish him), *aff'd*, 913 S.W.2d 581 (Tex. Crim. App. 1996). The jury could have rationally concluded that the failure to nourish and seek medical treatment in fact caused the serious bodily injury. *See Estrella*, 546 S.W.3d at 797 (child gained weight rapidly after reintroduction of food, which indicated that the child had been denied food previously).

The evidence is legally sufficient to support the jury's findings on the challenged elements. Appellant's ninth issue is overruled.

## II.   JURY CHARGE

In her first issue, appellant contends that the trial court erred by denying her requested lesser-included instruction for the offense of child endangerment. *See* Tex. Penal Code § 22.041. Appellant contends that child endangerment is a lesser-included offense of injury to a child, as charged, because child endangerment (1) is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or (2) differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person suffices to

15

establish its commission. *See* Tex. Code Crim. Proc. Art. 37.09(1)–(2).[7]  Appellant contends that the only difference between the two offenses is that injury to a child requires the defendant's omission to have "caused" an injury, while endangerment requires the child to have been "placed in imminent danger" of death or injury.

## A.    Legal Principles for Lesser-Included Offenses

There is a two-step test for determining whether a trial court is required to give a requested instruction on a lesser-included offense. *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016).  The first step asks whether the lesser-included offense is included within the proof necessary to establish the offense charged. *Safian v. State*, 543 S.W.3d 216, 219–20 (Tex. Crim. App. 2018).  Under the first step, the lesser offense is included within the proof necessary of the greater offense if the indictment for the greater offense either (1) alleges all of the elements of the lesser offense, or (2) alleges elements plus facts, including descriptive averments such as non-statutory manner and means, from which all of the elements of the lesser offense may be deduced. *Id.* at 220.

The second step asks whether there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, she is guilty only of the lesser-included offense. *Id.*  Under the second step, the evidence must show that the lesser offense is a valid, rational alternative to the charged offense. *Bullock*, 509 S.W.3d at 925.  We must examine all the evidence admitted at trial, and anything more than a scintilla of evidence is adequate. *Id.*  We may not consider the credibility of the evidence or whether it is controverted. *Id.*  However, "it is not enough that the jury may disbelieve crucial evidence pertaining to the

---

[7] The statute provides other circumstances for a lesser-included offense that are not applicable to this case. *See* Tex. Code Crim. Proc. Art. 37.09(3)–(4); *Safian v. State*, 543 S.W.3d 216, 220 n. 4 (Tex. Crim. App. 2018).

16

greater offense, but rather there must be some evidence directly germane to the lesser-included offense." *Id.* Evidence may be directly germane to the lesser offense if it refutes other evidence establishing the greater offense or if the evidence is subject to different interpretations. *Id.*

**B.    Analysis**

We assume without deciding that, as pled in the indictment in this case, child endangerment is a lesser-included offense under the first step of the test for obtaining a jury instruction. *See Mayhew v. State*, 271 S.W.3d 294, 300 (Tex. App.—Beaumont 2008, no pet.); *cf. Guzman v. State*, 188 S.W.3d 185, 191–92 & n.11 (Tex. Crim. App. 2006) (holding that deadly conduct was a lesser offense of reckless aggravated assault; noting that placing the complainant in imminent danger of serious bodily injury would be proven if the defendant actually caused serious bodily injury to the complainant); *Ford v. State*, 38 S.W.3d 836, 845 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (reasoning that "one who causes bodily injury . . . necessarily places the complainant in imminent danger" of bodily injury).

Turning to the second step, appellant contends that the following evidence shows that she "placed [the] complainant in imminent danger, rather than 'caused' harm":

- The eldest daughter's testimony that appellant "never actually did [punish the complainant] herself";
- Brad and appellant's testimony that Brad was responsible for the complainant and the couple had an agreement that they were not responsible for each other's children;
- Appellant's friend's testimony, "that's how it worked" in the house;
- The friend's testimony that appellant could not "do anything with [the complainant] without Brad's permission";

17

- Brad's testimony that he and the complainant lived with appellant "off and on," and the complainant was always with him;
- Brad's testimony that he gave the complainant unprescribed prescription medications;[8] and
- Appellant's counselor's testimony that she was a victim of domestic violence.[9]

This evidence, however, is not directly germane to child endangerment because it does not refute the causation element of injury to a child. The evidence does not show that appellant's omissions merely placed the complainant in danger of injury, rather than caused injury. In other words, this evidence does not show that if appellant is guilty, she is guilty *only* of the offense of child endangerment.

Appellant's first issue is overruled.

### III. EVIDENTIARY ISSUES

In her second through sixth issues, appellant complains about the admission and exclusion of evidence.

### A. Legal Principles for Standard of Review, Preservation of Error, and Harmless Error

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion if the decision falls outside the zone of reasonable disagreement. *Id.* at 83. Before we may overrule a trial court's evidentiary

---

[8] In her brief, appellant contends there is evidence that Brad "caused [the complainant]'s condition by, among other things, giving him unprescribed prescription medications." Appellant does not identify any evidence that the medications contributed to the complainant's chronic starvation.

[9] In her brief, appellant contends that the counselor testified that appellant was "in an abusive relationship with Brad." The record does not support this assertion regarding the counselor's testimony. The counselor did not testify about Brad specifically. Nonetheless, we note that there was other testimony about Brad being violent toward appellant, and we consider that evidence in evaluating this issue.

decision, we must hold that the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree. *See id.*

Furthermore, this court may not reverse a judgment of conviction without first addressing an issue of error preservation. *See Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016). As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling sought from the trial court with sufficient specificity to make the trial court aware of the complaint. *See* Tex. R. App. P. 33.1. A complaint on appeal must comport with the specific complaint that the appellant timely lodged in the trial court. *Penton v. State*, 489 S.W.3d 578, 580 (Tex. App.–Houston [14th Dist.] 2016, pet. ref'd); *see Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). The appellant must have conveyed to the trial court the particular complaint raised on appeal, including the precise and proper application of law as well as the underlying rationale. *Penton*, 489 S.W.3d at 580.

To preserve error regarding the admission of evidence, a party must object each time the inadmissible evidence is offered, obtain a running objection, or request a hearing outside the presence of the jury. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *see also* Tex. R. Evid. 103(b). To preserve error regarding the exclusion of evidence, in addition to articulating to the trial court why evidence should be admitted, a party must make an offer of proof describing the excluded evidence unless its substance is apparent from the context. *See Golliday v. State*, 560 S.W.3d 664, 668–69 (Tex. Crim. App. 2018); *see also* Tex. R. Evid. 103(a)(2). The purposes of an offer of proof are to enable the appellate court to determine whether the exclusion was erroneous and harmful, and

to allow the trial court to reconsider its ruling in light of the actual evidence. *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009).

Finally, we cannot reverse a conviction for mere evidentiary error unless it affects the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). In conducting this harm analysis, we consider the record as a whole. *Id.* We consider all of the admitted evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.*

## B.    Issue 2: Exclusion of Evidence

In her multifarious second issue, appellant complains about the trial court's exclusion of evidence on seven subjects. We address each complaint in turn.

### 1. Appellant's Niece's Testimony About Brad's Violence

Appellant complains about the exclusion of testimony from appellant's niece about a specific instance of violence that Brad committed against appellant:

Q. Did you see instances of domestic violence?
A. Yes, sir.
Q. And can you describe that to the members of the jury, please?
A. The day after my Papa John's funeral was probably the one that stood out the most. It was around April, 2013.
State: Objection to relevance.
Court: Sustained.

Appellant did not make an offer of proof, so any error is not preserved. *See Golliday*, 560 S.W.3d at 668–69.

20

## 2. Experts' Testimony About Hearsay Statements

Appellant complains about the trial court's sustaining of the State's hearsay objections to appellant's expert witnesses about a specific instance of violence that had been disclosed to them. The trial court held a Rule 702 hearing, *see* Tex. R. Evid. 702, outside the jury's presence and overruled the State's objection to appellant's counselor from testifying about domestic violence generally. After the trial court ruled, appellant's trial counsel informed the court that "there's probably going to be some hearsay statements . . . she relied upon to make her determination." The court explained, "And if the State objects, obviously, I will have to rule on it."

The State then made five hearsay objections to the counselor's testimony, which the trial court sustained. Appellant did not make an offer of proof for any of them. Nor did appellant articulate any theory for admission of the alleged hearsay. For these reasons, no error is preserved regarding the counselor. *See Golliday*, 560 S.W.3d at 668–69

Next, a psychologist who interviewed appellant testified. The State made two hearsay objections, which the trial court sustained. Outside the jury's presence, in response to the first objection, appellant's trial counsel argued that the expert had "some leeway to go into hearsay statements" under Rule 703. *See* Tex. R. Evid. 703. But, for neither of the State's objections did appellant make an offer of proof. For this reason, no error is preserved regarding the psychologist. *See Golliday*, 560 S.W.3d at 668–69.

## 3. Appellant's Testimony About Brad's Violence

Appellant complains about the trial court's exclusion of her testimony about an instance of abuse by Brad:

21

Q. Okay. So at some point, there were—was there a point at which you had any troubles with Brad?

A. There was a lot of points I had trouble with Brad, yes.

Q. What was the initial—was there an initial incident or initial set of circumstances?

A. Yeah. Shortly after he moved in, he bought a gun, and he held it to my head before I went over to take [a child]—

State: Your Honor, I'm going to object at this point to improper character evidence.

Court: Sustained.

Appellant also testified about how Brad became angry when he found out that appellant, who was pregnant at the time, had been in contact with the complainant's mother. He grabbed her by the throat, choked her, and told her that if she talked to the complainant's mother again, he would cut the baby out of her and kill her. He then pushed her onto a car until she promised to never speak to the complainant's mother again. Trial counsel asked, "Did you feel like he was capable of carrying out those threats?" The State objected to "leading," and the court sustained the objection.

Appellant did not make an offer of proof for either of these inquiries, so any error is not preserved. *See id.*[10]

### 4. Testimony About Brad's Violence Against the Complainant's Mother

Appellant complains about the trial court's exclusion of the complainant's mother's testimony about an alleged specific instance of violence by Brad:

---

[10] Moreover, we note that appellant's testimony about Brad holding a gun to appellant's head was, in fact, admitted before the jury because the State did not move to strike appellant's testimony. *See Heidelberg v. State*, 36 S.W.3d 668, 672–74 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("If the objection is sustained, the [party] must move to strike the evidence, that is, to have it removed from the body of the evidence the jury is allowed to consider. . . . When a motion to strike is required but is not made, the testimony is before the jury for whatever it is worth.").

Q. [D]o you recall Brad keeping a 9-millimeter pistol?

A. No

Q. So, you don't recall him threatening you with a pistol?

State: Objection, relevance.

Court: Sustained.

Similarly, Brad testified that there were several incidents of violence against the complainant's mother. When trial counsel asked Brad to describe them, the trial court sustained the State's relevance objection. When counsel asked Brad if he would consider it to have been "an abusive relationship on your part," the trial court sustained the State's objections to relevance, improper impeachment, and improper character evidence.

Appellant did not make an offer of proof for any of this evidence, so any error is not preserved. *See id.*

### 5. *Appellant's Testimony About an Ex-Husband's Purported Violence*

Appellant complains about the trial court's exclusion of her testimony about purported violence by an ex-husband:

Q. Was there—were there problems in the relationship [with an ex-husband]?

A. Yes. He became very angry.

Q. Okay. And when he became angry, what did he do?

A. He—

State: Your Honor, I'm going to object to relevance.

Court: Yes.

Defense: May we approach, Judge?

Court: Sure.

(Bench conference.)

Defense: So, Judge, we're just establishing the relationship. And, also, the children testified that there was abuse in the relationship. It also goes into what the expert says about the continuing—that they'll continue to go from relationships to relationships that are violent. They seem to choose the same types of people. We're not talking about Bradley Bleimeyer. . . . We also have the three children that testified against her that I do not think were very happy with her choices in men, and they were obviously very angry with her. And so, I think, that this goes to these relationships that she had that the children did not like.

Court: I hear you, but it's sustained as to relevance.

Appellant did not make an offer of proof, so any error is not preserved. *See id.*

But even if counsel's statement amounted to an offer of proof that "there was abuse in the relationship," and we assume without deciding the trial court erred, we cannot reverse appellant's conviction unless error such as this affected her substantial rights. *See Broussard v. State*, 434 S.W.3d 828, 835 (Tex. App.— Houston [14th Dist.] 2014, pet. ref'd) ("The exclusion of evidence that furthers appellant's defensive theory only incrementally is non-constitutional error.").

Often error in the exclusion of evidence is harmless if the evidence is cumulative of other evidence or the nature of the evidence is established through other means. *See Robison v. State*, 461 S.W.3d 194, 200, 202 (Tex. App.— Houston [14th Dist.] 2015, pet. ref'd); *Lindsay v. State*, 102 S.W.3d 223, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). Here, the excluded evidence related to appellant's ex-husband, Kevin Frank. Multiple State's witnesses testified about violence that Frank perpetrated against appellant. For example, appellant's eldest son testified that Frank was an abusive person who beat up appellant, and the son knew that Frank had been prosecuted and convicted of "domestic violence." A witness who did the home study for Brad's adoption of one of appellant's children testified similarly that there was domestic violence associated with Frank and

24

another ex-husband. Other witnesses testified about domestic violence against appellant by men other than Frank. And there was plenty of evidence that Brad was abusive.

Considering the excluded evidence in relation to the other similar evidence that the jury heard, and in light of the entire record, we cannot conclude that the exclusion of appellant's proffered testimony that "there was abuse in the relationship" with Frank had a substantial and injurious effect or influence in determining the jury's verdict. *See Robison*, 461 S.W.3d at 200, 202; *Lindsay*, 102 S.W.3d at 230.

### 6. Appellant's Testimony About Brad Giving the Complainant Medications

Appellant complains about the trial court excluding "evidence of Bradley Bleimeyer's giving unprescribed controlled substances" to the complainant. At the conclusion of appellant's first day of testimony, the subject turned to Brad's giving medications to the complainant:

Q. Do you know whether Brad was giving him medications?
A. Brad told me—
State: Objection to hearsay.
Court: Sustained.
Q. Were there medications in the household?
A. Yes.
Q. From what you understand, did you see the medications moved around—
State: Objection to leading.
Court: Sustained.
Q. Were the medications in a certain spot that you recall, and did they end up in a different place?
A. Yes.
Q. What kind of medications?
A. It was [the eldest son's] bipolar—
State: Objection. This goes to relevance.

25

Court: Sustained.
Defense: May I approach, Your Honor?
Court: Certainly.

Trial counsel argued that Brad's giving medications to the complainant, which Brad had already admitted to in his testimony, was relevant to how the complainant's condition deteriorated. The court clarified, "So your question is: 'What medication did you observe Brad giving to [the complainant]?' That objection is overruled." The court suggested that appellant could testify about "[w]hat she observed, what she knows personally, and to the complainant." Then, the trial concluded for the day. During the second day of her testimony, appellant was not asked about whether or what medications Brad administered to the complainant.

On appeal, appellant argues only that the evidence was relevant; she makes no argument that the evidence wasn't hearsay and cites no relevant authorities. Thus, any complaint about the exclusion of hearsay is waived. *See, e.g.*, *Dowling v. State*, 608 S.W.3d 896, 901–02 (Tex. App.—Houston [14th Dist.] 2020, no pet.). And, no error is preserved regarding appellant's complaint on appeal that the trial court excluded evidence of Brad giving unprescribed medications to the complainant, generally, because the trial court did not make an adverse ruling on the subject, *see Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003), nor did appellant make an offer of proof, *see Golliday*, 560 S.W.3d at 668–69.

### 7. *Recording of Appellant's Statement to Her Employer*

Appellant contends that the trial court erred by "excluding the recording of [appellant] telling her boss that she could not control Brad."

Appellant testified that her employer prohibited Brad from coming on their premises. She testified that she did not want to lose her job, but she ultimately lost

26

it "[b]ecause I couldn't control Brad." In rebuttal, the State presented testimony from her employer that she quit and was not fired. Appellant offered the recording as an exhibit, and the court asked, "Under what theory are you moving to admit it?" Trial counsel argued:

> He is saying that she quit as opposed to his statement was that she was not fired. And Tammi's testimony was that she was fired. So they called him in to impeach her, so we had every right to impeach him with our own evidence. . . . He's not denying having the conversation, but it's there to refute what he said and what the assertion is. If he is saying she quit, but we're showing that, no, you fired her, that's why this needs to come in.

The State argued that the recording was improper impeachment because it was extrinsic evidence of a prior statement and that the employer needed to be given an opportunity to confirm or deny the statement and explain. The court told trial counsel, "And I think you're entitled to ask him about anything on that recording in front of the jury," and, "You have to ask the witness a particular statement they made and whether to admit or deny that statement." *See* Tex. R. Evid. 613(a)(4). Ultimately, trial counsel followed the procedure outlined by the court and the rules, and the employer admitted to making the statements on the record. The employer testified that the following statements were made: (1) appellant's statement, "Well, I can't control Brad, and if you're—are you firing me because I can't control Brad"; and (2) the employer's statement, "If you can't control him, then you can't keep your job." Appellant did not again offer the recording into evidence.

Appellant's argument at trial was that the employer's inconsistent statement was admissible to impeach the employer's testimony. But on appeal she argues that the recording was admissible to show her own statement that she could not control Brad. This complaint does not comport with her argument to the trial court, and it is therefore not preserved. *See Pena*, 285 S.W.3d at 464; *Penton*, 489

27

S.W.3d at 580. Moreover, appellant cites no legal authority to support her argument that the recording of her own statement was admissible, so the argument is waived due to inadequate briefing. *See, e.g.*, *Dowling*, 608 S.W.3d at 901–02. Finally, because the employer admitted to the statement appellant made about not being able to control Brad, any error in not admitting the recording of the statement could not have had a substantial and injurious effect or influence in determining the jury's verdict. *See Robison*, 461 S.W.3d at 200, 202; *Lindsay*, 102 S.W.3d at 230.

Appellant's second issue is overruled.

## C.     Issue 3: Admission of Conservatorship Employee's Testimony About Alleged Post-Arrest Silence

In her third issue, appellant complains about the trial court admitting evidence of her post-arrest silence through an employee at the Department of Family and Protective Services who interviewed appellant after her arrest while her children were under the conservatorship of the Department. Specifically, the employee testified that appellant was "not forthcoming" in their conversations. Appellant contends that the evidence was irrelevant and violated her rights under the Texas and United States Constitutions.

Appellant did not object to this testimony when it was admitted. Rather, appellant moved to suppress "any statements that were made post-arrest to [the employee], if they were not Mirandized," arguing that the employee was considered a member of law enforcement. The trial court held a suppression hearing to rule on this issue and determine the voluntariness of appellant's statements. But appellant never asked the court to exclude her post-arrest silence or invocation of the right to remain silent. Thus, her complaint on appeal does not comport with the one at trial, and the issue is not preserved. *See Penton*, 489

28

S.W.3d at 580; *see also Resendez v. State*, 306 S.W.3d 308, 313–17 (Tex. Crim. App. 2009) (holding that a complaint to the trial court that the police "did not *Mirandize* him on the tape" did not preserve an argument that warnings had to be recorded; reasoning that a complaint that could be read to express more than one legal argument will generally not preserve all potentially relevant arguments for appeal); *Heidelberg v. State*, 144 S.W.3d 535, 542–43 (Tex. Crim. App. 2004) (holding that an objection to the State's use of post-arrest, post-*Miranda*-warning silence under the Fifth Amendment did not preserve complaint based on state law protection of post-arrest, pre-warning silence).

Appellant's third issue is overruled.

**D.** **Issue 4: Admission of Police Officer's Testimony About Alleged Post-Arrest Silence and Invocation of Counsel**

In her fourth issue, appellant complains about the admission of the following testimony from the arresting officer:

Q. Were you able to talk to Tammi Bleimeyer?

A. No, I was not.

Q. Why not?

A. I was made aware that Tammi had an attorney and didn't—we were not able to speak with her because she had an attorney.

Appellant did not object. She contends on appeal that we should address fundamental error, citing Tex. R. Evid. 103(e).

Generally, a party must preserve error to complain about the admission of evidence of post-arrest silence, *see Heidelberg*, 144 S.W.3d at 542–43, and the invocation of the right to counsel, *see Rezac v. State*, 782 S.W.2d 869, 871 (Tex. Crim. App. 1990). Accordingly, these rights are not "fundamental" for purposes of Rule 103(e) of the Texas Rules of Evidence. *See Proenza v. State*, 541 S.W.3d

786, 792, 795 (Tex. Crim. App. 2017) (noting that "fundamental error" as used by Rule 103(e) does not include error for which preservation is required under the framework of *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993)).

Appellant's fourth issue is overruled.

### E.     Issue 5: Admission of the Complainant's Statements to Social Worker

In her fifth issue, appellant complains about the trial court's admission of the complainant's statements that he made to a social worker soon after he was admitted to the hospital.  Appellant contends that the statements were hearsay and not subject to the medical-treatment exception.  In her brief, appellant references a few questions to which she objected:

Q.  Was he able to express things that he wanted or needed?

A.  Yes.

Q.  What was his primary concern?

Defense:  Judge, I object, calls for hearsay.

Court:  Any exception?

State:  Statements made for medical treatment purposes.

Court:  All right. It's overruled.

Q.  What did he tell you?

A.  When first speaking to him, he had expressed that he did not feel safe at home.

Q.  And what other things did he express?

A.  He expressed to me how he obtained some of the bruises to his body as well as to what I believe to his malnourished state.

Defense:  Judge, I would object to hearsay. These are not statements related to medical treatment.

Court:  All right. Respectfully overruled.

Q.  What else?

A.  He was able to express to me who actually—you know, that he had been hit with a belt, he had been punched, to those remarks, which to me was important for his emotional wellbeing as part of his medical care.

Appellant complains about the admission of additional testimony to which she did not object, such as appellant's statement that both Brad and appellant "inflicted the punishment." Because appellant did not continue to object or request a running objection, any error in the admission of testimony not quoted above was not preserved. *See, e.g., Ethington v. State*, 819 S.W.2d 854, 859–60 (Tex. Crim. App. 1991); *Sanchez v. State*, 595 S.W.3d 331, 337–38 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

Assuming without deciding that the trial court erred in overruling these objections, appellant was not harmed. Generally, error in the admission of evidence is harmless if very similar evidence was admitted without objection. *See Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998); *see also Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010). Here, the complainant's medical records were admitted as an exhibit without objection, including a narrative statement from the social worker that contained the same statements to which appellant objected:

> I asked him if he felt safe living in the home with his dad and Tammy and he shook his head "no" and when I asked why, "he stated that they are mean to him". I asked him how they were mean and he stated "he gets in trouble a lot and is not allowed to eat". The pt further shared that he sleeps in a "very dark closet that is in the living room under the stairs". he stated that he has "always slept there". He went to share that Tammy "got mad at him because the clothes fell off the hanger and she asked him why he did it and he said "I did not do it but she did not believe me and I got in trouble". When asked what happens to him when he gets in trouble he told me "that he gets hit on his butt and legs with a belt". He also reported that "Brad punches me

31

in the stomach with his fist". At this time he raised his shirt and point to his belly button". [sic]

Considering the cumulative nature of the social worker's testimony, in light of the entire record, we cannot conclude that this alleged error had a substantial and injurious effect or influence in determining the jury's verdict. *See Sanchez*, 595 S.W.3d at 340–41; *see also Lamerand v. State*, 540 S.W.3d 252, 257 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (harmless error from the admission of a medical report containing inadmissible hearsay from the child complainant because the doctor testified about the same statements without objection).

Appellant's fifth issue is overruled.

## F.      Issue 6: Admission of Photographs of the Complainant

In her sixth issue, appellant complains about the admission of seven photographs in Exhibits 38, 39, and 58 through 62. Appellant did not object to Exhibit 58, so no error is preserved. *See* Tex. R. App. P. 38.1. The remainder of the exhibits are photographs of the complainant while he was in the hospital, depicting his condition. At trial, appellant's "only objection [was] cumulative evidence." On appeal, appellant contends that the photographs are cumulative and unfairly prejudicial under Rule 403 of the Texas Rules of Evidence. *See* Tex. R. Evid. 403. Appellant's complaint regarding the cumulative nature of the photographs is preserved, but his complaint about unfair prejudice is not. *See Williams v. State*, 294 S.W.3d 674, 685 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (objection that photograph was cumulative did not preserve complaint about unfair prejudice); *Williams v. State*, 930 S.W.2d 898, 900–02 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) (same).

A trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of needlessly presenting cumulative

evidence. Tex. R. Evid. 403. A trial court has considerable discretion when ruling on the admissibility of photographs, *see Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988), and under Rule 403, *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007).

Generally, photographs that are closer up than others or from different angles or vantage points are not cumulative. *See Matamoros v. State*, 901 S.W.2d 470, 476 (Tex. Crim. App. 1995) (overruling argument that photographs were cumulative of video evidence; "Close-up photographs and photographs taken from different vantage points add to the jury's understanding of the condition of the crime scene."); *Williams*, 294 S.W.3d at 686 (photograph not cumulative because it showed injuries from a side view while other photographs showed frontal view); *Woods v. State*, 14 S.W.3d 445, 452–53 (Tex. App.—Fort Worth 2000, no pet.) (photograph not cumulative because it showed injuries to the child from a different angle, closer up, and clearer compared to other admitted photograph); *Williams*, 930 S.W.2d at 902 (photograph not cumulative because it showed injuries clearer than other photographs).

Exhibits 38, 39, and 59 through 62 are photographs of the complainant while he was in the hospital. Most of them show the complainant's emaciated body or parts thereof. They are similar to eighteen other admitted photographs of the complainant only in that regard. Otherwise, they show the complainant from different angles or distances or depict different injuries or body parts of the complainant. Having reviewed these photographs in comparison to the others that were admitted, we cannot conclude that the trial court abused its considerable discretion in admitting them over appellant's objection that the photographs were cumulative. *See Williams*, 294 S.W.3d at 686, *Woods*, 14 S.W.3d at 452–53; *Williams*, 930 S.W.2d at 902.

Appellant's sixth issue is overruled.

## IV.  PUNISHMENT ARGUMENT

In her seventh issue, appellant contends that the State's argument to the jury during the punishment phase amounted to fundamental error.

The State told the jury, "What you know is whatever punishment you assess if it's a prison sentence, you know that at some point she can get out, and she can get out earlier than that number based on the fact that the parole law exists.  You don't know when, but you know it does exist."  Appellant did not object.

"The right to a trial untainted by improper jury argument is forfeitable." *Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) (citing *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)).  "Even an inflammatory jury argument is forfeited if the defendant does not pursue his objection to an adverse ruling." *Id.*

Appellant contends that no objection was necessary, citing *McCain v. State*, No. B14-87-00614-CR, 1998 WL 69602 (Tex. App.—Houston [14th Dist.] June 30, 1988, no pet.) (not designated for publication).  Her reliance on *McCain* is unpersuasive because the opinion is not binding precedent, *see* Tex. R. App. P. 47.7(a), addressed the inclusion of an improper instruction in the jury charge, which is governed by a different preservation standard, *see, e.g., Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020), and relied on precedent that has been superseded by constitutional amendment, *see Johnson v. State*, 800 S.W.2d 563, 567 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd).

Appellant failed to preserve error.  *See Hernandez*, 538 S.W.3d at 622.  Her seventh issue is overruled.

## V.     CUMULATIVE ERROR

Pointing to most of her other alleged errors that we have found either unpreserved or harmless, appellant contends in her eighth issue that the trial was fundamentally unfair and requires reversal under the cumulative error doctrine.

"The cumulative error doctrine provides relief only when constitutional errors so fatally infect the trial that they violated the trial's fundamental fairness." *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (quotation omitted). We do not consider the effect of any waived errors. *Temple v. State*, 342 S.W.3d 572, 612 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013); *see also Schmidt v. State*, No. 01-18-00239-CR, 2019 WL 5432049, at *10 (Tex. App.—Houston [1st Dist.] Oct. 24, 2019, pet. ref'd) ("In a cumulative-error analysis, we consider only errors that were preserved for appeal. The cumulative-error doctrine does not apply unless the complained-of errors have been preserved for appeal and are actually errors." (citations omitted)).

Appellant's alleged constitutional errors were not preserved, like most of her other alleged errors. Based on this record and the half-page argument presented in her brief, we cannot conclude that appellant's trial was fundamentally unfair. *See Estrada*, 313 S.W.3d at 311.

Appellant's eighth issue is overruled.

## VI. CONCLUSION

Having overruled each of appellant's issues, we affirm the trial court's judgment.

/s/ Ken Wise
   Justice

Panel consists of Chief Justice Christopher and Justices Wise and Zimmerer.

Publish — Tex. R. App. P. 47.2(b).